[Cite as *State v. Jones*, 2011-Ohio-6063.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No.    25695 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| PHILLIP L. JONES | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No.    CR 2007 04 1294 |

DECISION AND JOURNAL ENTRY

Dated: November 23, 2011

DICKINSON, Judge.

INTRODUCTION

**{¶1}** Phillip Jones has been sentenced to die for raping and strangling Susan Yates. While Mr. Jones admitted killing Ms. Yates, he claimed it was an accident that happened when she asked him to choke her as they were having consensual sex. Following his trial, Mr. Jones petitioned for post-conviction relief, arguing that the trial court incorrectly admitted other acts evidence, that jurors committed misconduct, and that his trial lawyers were ineffective at the guilt and penalty stages of his trial. He also moved for discovery and the appropriation of funds so that he could obtain neurological testing. The trial court denied his petition, determining that his other acts claims are barred because he also raised them on direct appeal, that the evidence submitted in support of his juror misconduct claims was incompetent, and that his lawyers were not ineffective. It also denied his motions for discovery and testing funds. Mr. Jones has appealed, assigning three errors. We affirm the trial court's decision in part because Mr. Jones

did not receive ineffective assistance during the guilt phase of his trial, the court properly rejected his other acts and juror misconduct claims, and the court correctly denied his motions for discovery and testing funds. We vacate its determination that Mr. Jones's lawyers were not ineffective regarding the penalty phase of his trial and remand for an evidentiary hearing on that issue.

## BACKGROUND

{¶2} On the morning of April 23, 2007, a man was jogging through a cemetery when he discovered Ms. Yates's body lying near some headstones. According to the county medical examiner, she had bruises on her head, external and internal neck injuries, and eye and facial petechia (spots caused by the breaking of small blood vessels). She was dressed in multiple layers, including a summer dress and denim skirt. Several buttons were missing from the dress and were lying in the road. The skirt had a slit, but it had been torn apart even more from where the slit had ended. Ms. Yates's bra was also torn between the cups and there was a small, plastic, glow-in-the-dark cross lying over one of her eyes.

{¶3} The medical examiner concluded that Ms. Yates's cause of death was asphyxia by strangulation and that the manner of her death was homicide. He also concluded that Ms. Yates had been vaginally and anally raped. A couple of days after Ms. Yates's body was found, Mr. Jones's wife told the police that Mr. Jones was the one who killed her. Mr. Jones's semen was found on Ms. Yates's skirt and on a vaginal swab. The cross that had been found over Ms. Yates's eye was similar to one that Mr. Jones had given to his wife a year earlier.

{¶4} The Grand Jury indicted Mr. Jones for aggravated murder, murder, and rape. He was arraigned on May 15, 2007. In August 2007, the court determined that Mr. Jones was competent to stand trial and set a trial date for December 3. On October 22, the Grand

Jury issued a supplemental indictment, adding death penalty and repeat offender specifications. Mr. Jones was arraigned on the supplemental indictment two days later.

{¶5} At the October 24 arraignment, Mr. Jones's lawyers acknowledged that a mitigation investigation normally "takes several months," but did not move for a continuance. Instead, they said that they had agreed with the prosecutor to keep the December 3 trial date. They also suggested scheduling two or three days in January 2008 for the penalty phase of the trial, if it proved necessary. At the hearing, Mr. Jones's lawyers also presented the court with an order allowing them to retain Dr. James Siddall, a psychologist, so that he could begin conducting interviews and testing for mitigation purposes. The court signed the proposed order that same day. According to the statement Dr. Siddall submitted after trial, between October 24, 2007, and January 8, 2008, he spent four and a half hours consulting with Mr. Jones's lawyers. His statement also indicated that on November 21 and December 12 he did a total of 7.75 hours of "[i]nterviews and testing."

{¶6} On November 1, Mr. Jones's lawyers moved for appropriation of funds to hire a defense mitigation expert. At a hearing on November 15, the court granted the motion and ordered Mr. Jones's lawyers to prepare an entry appointing Thomas Hrdy as that expert. While the record does not indicate when Mr. Jones's lawyers submitted a proposed entry, the trial court entered an order appointing Mr. Hrdy on December 5. According to the invoice Mr. Hrdy submitted after trial, he began working on Mr. Jones's case on December 10.

{¶7} According to the affidavits submitted by Mr. Jones's family members, either Mr. Hrdy did not spend much time with them asking about their family background or no one from Mr. Jones's defense team attempted to speak with them at all. According to Mr. Hrdy's invoice, on December 20, he spent 3.5 hours interviewing Mr. Jones's mother and his oldest sister.

On December 23, he spent 4.5 hours "[m]eeting w/ family @ [Mr. Jones's mother's] home." On January 2, he billed 2 hours for "[i]nterview w/ family, drop off records (Siddall)." Finally, on January 5, he billed 4 hours for "[m]eeting w/ family, atty." There is no additional detail in the record regarding which "family" members he met or how he divided his time between the two activities listed on each of the January dates.

## POST-CONVICTION RELIEF

**{¶8}** Mr. Jones's first assignment of error is that the trial court incorrectly dismissed his petition for post-conviction relief even though he presented sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing. Under Section 2953.21(A)(1)(a) of the Ohio Revised Code, "[a]ny person who has been convicted of a criminal offense . . . and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States . . . may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief."

**{¶9}** "In postconviction cases, a trial court has a gatekeeping role as to whether a defendant will even receive a hearing." *State v. Gondor*, 112 Ohio St. 3d 377, 2006-Ohio-6679, at ¶51. "Before granting a hearing on a [post-conviction relief] petition . . . , the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript." R.C. 2953.21(C). "[W]hether there are substantive grounds for relief" under Section 2953.21(C) means "whether there are grounds to

believe that 'there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.'" *State v. Calhoun*, 86 Ohio St. 3d 279, 283 (1999) (quoting R.C. 2953.21(A)(1)). "[A] trial court properly denies a defendant's petition for postconviction relief without holding an evidentiary hearing [if] the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Id*. at paragraph two of the syllabus. It is "not unreasonable to require the defendant to show in his petition for postconviction relief that such errors resulted in prejudice before a hearing is scheduled." *Id*. at 283.

{¶10} The Ohio Supreme Court has held that the trial court's gatekeeping role is entitled to deference. *State v. Gondor*, 112 Ohio St. 3d 377, 2006-Ohio-6679, at ¶52. This includes the trial court's assessment of the credibility of affidavits. *Id*. "[A] trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion[.]" *Id*. at ¶58.

{¶11} Mr. Jones asserted 17 grounds for relief in his petition, which the trial court separated into three categories: arguments that his lawyers were ineffective during the guilt phase of his trial, arguments that his lawyers were ineffective during the penalty phase of his trial, and arguments not involving ineffective assistance of counsel. We will address Mr. Jones's arguments using those same categories.

GUILT-PHASE INEFFECTIVE ASSISTANCE

A.     Consensual Sex Expert

{¶12} Mr. Jones's first ground for relief was that his trial lawyers should have called an expert witness to establish that the sex he had with Ms. Yates was consensual. He argued that

there were alternative explanations for the trauma to Ms. Yates's genitalia and that, if it was not rape, the murder charge would not have been a capital offense.

{¶13} To establish ineffective assistance of counsel, Mr. Jones "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St. 3d 118, 2008-Ohio-3426, at ¶204; *State v. Bradley*, 42 Ohio St. 3d 136, paragraph two of the syllabus (1989)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

{¶14} The state medical examiner testified that Ms. Yates was sexually assaulted, pointing to bruising of the walls of her vagina and rectum and a small twig that was recovered from fecal matter in her rectum. He opined that the bruising was deeper inside Ms. Yates than a penis could cause and was consistent with something long and inflexible like a tool handle. He also testified that he found a wad of tissues or toilet paper inside Ms. Yates's vagina. The State's theory was that Mr. Jones attempted to clean his semen out of Ms. Jones's vagina and rectum and used a stick to insert and retrieve the paper. While he was able to retrieve the paper from her rectum, leaving the small twig, he was unable to get it out of her vagina.

{¶15} In support of his petition, Mr. Jones presented an affidavit by Dr. Werner Spitz, a forensic pathologist, who asserted that it is likely that any bruising to Ms. Yates's perivaginal, perianal, and perirectal soft tissues was actually the result of pulling and tugging associated with the process used to extract pelvic organs from the body during an autopsy. He wrote that, "[i]n the absence of actual organ injury and damage to the overlying skin, including the perineum, it is my opinion that the pelvic hemorrhage described in the autopsy report was the result of

art[i]fact." Dr. Spitz also asserted that, because there were no perforations to Ms. Yates's rectum, she was not wearing any underwear, and there was dirt and debris found in her hair and on the back of her clothing, the small twig likely entered her rectum while Mr. Jones was attempting to resuscitate her. Dr. Spitz further opined that the fact that there was a small wad of paper in Ms. Yates's vagina suggests that the sex was consensual. According the Dr. Spitz, some women use paper as a contraceptive, and this would be consistent with Mr. Jones's testimony that Ms. Yates excused herself to urinate shortly before they engaged in sex. Dr. Spitz opined that Ms. Yates likely told Mr. Jones that she had to go to the bathroom so that she had an excuse to leave to place the paper wad.

{¶16} The trial court wrote that, except for the testimony of the people engaged in a sex act, it was unaware of any testimony, expert or otherwise, that can conclusively determine whether sex is consensual. It also noted that Dr. Spitz's affidavit did not account for the trauma that the medical examiner said had been inflicted to Ms. Yates's head. It further noted that Mr. Jones's lawyer had thoroughly cross-examined the medical examiner about his conclusions. It concluded that the lawyers' decision not to obtain an expert was a matter of trial strategy that did not constitute ineffective assistance, similar to *State v. Thompson*, 33 Ohio St. 3d 1, 10-11 (1987) (concluding that trial counsel was not ineffective for not obtaining the appointment of a forensic pathologist in rebutting state's witness on issue of rape).

{¶17} In his brief, Mr. Jones has argued that his trial lawyers were ineffective because they failed to retain an expert to refute the medical examiner's rape findings. He has argued that, under the American Bar Association's guidelines for the appointment and performance of counsel in death penalty cases, his lawyers had a duty to conduct a thorough examination of his

guilt. He has also argued that, because Ms. Yates's rape was the only capital specification in his trial, if he had not been found guilty of rape, he could not have been sentenced to death.

{¶18} We conclude that Mr. Jones has failed to demonstrate that the outcome of his trial would have been different if Dr. Spitz had testified. The state medical examiner testified that, at a certain point, the rectum curves and connects to the colon. He said that, if something is inserted into the rectum that is inflexible, it will eventually bump into tissue at that curve, which is where Ms. Yates had contusions. Dr. Spitz failed to explain in his affidavit why, if something was inserted so far into the rectum to cause such a contusion, he would expect "actual organ injury" or "damage to the overlying skin, including the perineum." We also note, as the trial court did, that Dr. Spitz did not attempt to explain how the abrasions and contusions that Ms. Yates suffered to her head are consistent with consensual sex. Furthermore, while Dr. Spitz's paper as contraception explanation makes sense in theory, Mr. Jones testified that Ms. Yates urinated in the road in front of him while he watched. While he said that she wiped herself, he did not say anything about her placing paper in her vagina. Finally, while it may have been possible for a small twig to become slightly embedded in Ms. Yates's rectum if Mr. Jones was moving her around while trying to revive her, Dr. Spitz did not offer an adequate explanation for the fact that the medical examiner discovered the twig four to six inches inside of her rectum. We, therefore, conclude that the trial court exercised proper discretion when it determined that Dr. Spitz's affidavit was insufficient to establish that Mr. Jones's trial lawyers were ineffective for not calling a sexual assault expert.

B.     Erotic Asphyxiation Expert

{¶19} Mr. Jones also argued in his petition that his trial lawyers were ineffective during the guilt phase of his trial because they failed to call an expert on erotic asphyxiation. He

submitted the affidavit of Jay Wiseman, who claimed to be an expert on alternative sexual practices. According to Mr. Wiseman, he could have bolstered Mr. Jones's testimony regarding Ms. Yates's request to be choked during sex by explaining to the jury what erotic asphyxiation is, its prevalence, and its risks. In particular, Mr. Wiseman asserted that he would have testified that it is impossible to know when erotic asphyxiation is about to go too far and that death can occur within only a few seconds.

{¶20} The trial court determined that Mr. Wiseman's affidavit failed to demonstrate ineffective assistance because he did not opine that he had reviewed the autopsy findings and found them consistent with erotic asphyxiation. In his appellate brief, Mr. Jones has repeated the arguments he made in his petition, asserting that his trial lawyers failed to conduct a complete examination into his defense.

{¶21} The trial court properly determined that Mr. Wiseman's testimony would not have undermined the medical examiner's conclusions about the circumstances of Ms. Yates's death. While Mr. Wiseman asserted that the he could have convinced the jury that people actually do engage in erotic asphyxiation, that fact was not contested by the medical examiner. The medical examiner agreed that some people engage in such acts, but testified that Ms. Yates's injuries were inconsistent with anything he had ever seen or seen reported as erotic asphyxia. According to the medical examiner, Ms. Yates's injuries were consistent with a violent act, not a recreational act. He testified that, contrary to Mr. Jones's testimony that he heard a popping sound followed by Ms. Yates's immediate death, the medical evidence showed that her death was the result of the slow increase of blood in her skull. He testified that, because of the compression of Ms. Yates's neck, blood was able to enter her head but not exit. The increased pressure caused small blood vessels in her face to break, causing the petechia that was on her

face. After 10 to 20 minutes, the blood in the head would have been depleted of oxygen, causing death by asphyxia. The medical examiner also explained that, although some of the cartilage in Ms. Yates's neck was fractured, it would not have made a popping sound as it fractured. Mr. Wiseman did not point to any medical evidence that was consistent with Mr. Jones's erotic asphyxiation story. We, therefore, conclude that the trial court exercised proper discretion when it determined that Mr. Jones failed to show that his lawyers were ineffective for not calling an expert in erotic asphyxiation.

C.     Victim Photograph

{¶22} Mr. Jones also argued in his petition that his trial lawyers were ineffective during the guilt phase of his trial because they did not show a photograph of Ms. Yates to Deitra Snodgrass, who testified that Mr. Jones came to her house one evening with a woman matching Ms. Yates's description and that the woman already had a number of bruises. Ms. Snodgrass's testimony was consistent with Mr. Jones's testimony that, on the night of the incident, he came upon Ms. Yates involved in a fight with a man, broke up the fight, and drove Ms. Yates to Ms. Snodgrass's house because he thought Ms. Snodgrass might know someone who could sell her cocaine.

{¶23} Although Ms. Snodgrass initially testified that the woman who was with Mr. Jones when he was at her house had a similar build and was wearing clothes that matched the clothes Ms. Yates was found in, on cross-examination she testified that she did not think it was Ms. Yates who was in her apartment that evening. In his petition, Mr. Jones argued that, if his lawyers had shown a picture of Ms. Yates to Ms. Snodgrass, Ms. Snodgrass could have positively identified her as the woman she saw with Mr. Jones. The trial court inferred that Mr.

Jones's lawyers' failure to show Ms. Snodgrass Ms. Yates's picture was a tactical decision, which did not constitute ineffective assistance.

{¶24} Mr. Jones submitted an affidavit by Ms. Snodgrass that asserted that, if she had been shown a picture of Ms. Yates, she could have identified Ms. Yates as the person she saw in her apartment with Mr. Jones. In his brief, Mr. Jones has argued that the only reason the prosecution was able to cast doubt on her testimony was because she did not see a picture and, therefore, could not say that she was certain it was Ms. Yates she saw.

{¶25} Even if Ms. Snodgrass had been shown Ms. Yates's picture, Mr. Jones has not demonstrated that it is reasonably probable that the outcome of his trial would have been different. The medical examiner testified that Ms. Yates's neck had abrasions that were consistent with fabric being twisted against it and small gouges, which were consistent with Ms. Yates digging at her neck in resistance to the act. This was inconsistent with Mr. Jones's story that he only applied steady pressure in one spot with his hands.

{¶26} On cross-examination, the medical examiner conceded that, if there were two strangulation events close in time, he might not be able to determine that from the autopsy. According to Ms. Snodgrass, the woman with Mr. Jones had bumps and bruises to her face. That was consistent with Mr. Jones's testimony about her having been in a fight. She did not say, however, whether the woman had any injuries to her neck. Accordingly, even if she had been unequivocal in her testimony that Ms. Yates was the woman who had been at her house, her testimony would not have supported Mr. Jones's theory that Ms. Yates experienced a strangulation event before having sex with him. The trial court exercised proper discretion when it denied Mr. Jones's petition regarding this ground for relief.

D.    Photographs of Mr. Jones's Hands

{¶27} Mr. Jones further argued in his petition that his trial lawyers were ineffective during the guilt phase of his trial because they did not submit photographs showing that his hands were uninjured at the time he was arrested. He argued that, if he had violently strangled Ms. Yates, she would have resisted, inflicting scratch marks or other injuries to his hands. The trial court noted that the inference that Mr. Jones, apparently, would have wanted the jury to draw was that, since there were no injuries to his hands, the sex and choking must have been consensual. The court, however, rejected his argument as speculative.

{¶28} The detective who arrested Mr. Jones testified that Mr. Jones's hands were uninjured. Accordingly, photographs of Mr. Jones's hands would have been merely cumulative. In addition, the fact that Mr. Jones's hands were uninjured is not inconsistent with the medical examiner's explanation of Ms. Yates's death. As noted earlier, the medical examiner testified that the abrasions he saw were consistent with someone twisting clothing tight against Ms. Yates's neck. If that was the method Mr. Jones used to restrict the blood flow from Ms. Yates's head, it is possible that she would have pulled at the fabric instead of his hands as she resisted.

{¶29} In his brief, Mr. Jones has acknowledged that there was no dispute over the detective's testimony that his hands were uninjured, but has argued that the court should have held a hearing to determine why his lawyers did not introduce "obvious evidence at their own disposal." We conclude, however, that the trial court exercised proper discretion when it denied Mr. Jones's petition on this ground. To the extent that Mr. Jones's first assignment of error is that the trial court should have held a hearing to determine whether his lawyers were ineffective during the guilt-phase of his trial, it is overruled.

PENALTY-PHASE INEFFECTIVE ASSISTANCE

{¶30}  Mr. Jones next argued in his petition that his trial lawyers were ineffective during the penalty phase of his trial.  Specifically, he argued that they should have sought a continuance so that they would have had a reasonable amount of time to conduct a proper mitigation investigation, that they failed to conduct a reasonable investigation into his background, that they failed to present available, relevant, and compelling mitigating evidence from his family members, that they failed to adequately prepare witnesses to testify, that they failed to present sufficient psychological mitigating evidence, that they failed to present evidence of his neurological damage,  and that they failed to present his hospital records.

{¶31} During the penalty phase, Dr. James Siddall, a psychologist, testified that psychiatric, substance abuse, and criminal justice problems go back in Mr. Jones's family for generations.  Regarding Mr. Jones's childhood, he explained that domestic violence led to the divorce of Mr. Jones's parents, that Mr. Jones was subject to some of the abuse, and that Mr. Jones's siblings abused drugs and had psychiatric conditions such as bipolar disorder and schizophrenia.  In light of those issues, none of his family members could be considered good role models.  Dr. Siddall explained that Mr. Jones also had a wandering eye as a child, which caused him to be bullied and harassed.  He also explained that Mr. Jones had learning disabilities which, combined with instability from moving to different schools, caused him to be held back a couple times.  He further explained that Mr. Jones had a long history of depression and other mental illness, leading him to attempt suicide several times, including drinking gasoline when he was eight, overdosing on pills and trying to hang himself as a teen, and engaging in self-mutilation while incarcerated for a previous offense.  Dr. Siddall diagnosed Mr. Jones as having mood and anti-social personality disorders.

{¶32} Mr. Jones's mother testified that she grew up in foster homes, that she fought with her husband, and that all eight of her children have faced substance abuse problems. Regarding Mr. Jones, she talked about the fact that he bounced around in custody, that he was picked on because of his eye, that he had problems in school, and that he attempted to commit suicide a couple of times. On cross-examination, however, she explained that her husband and she had worked hard to provide for their children, that they took steps to correct Mr. Jones's eye problems, that, despite their problems, they eventually reconciled and remarried, and that Mr. Jones's father was a good role model. She described Mr. Jones as a typical kid, who developed a close bond to his siblings that continued to the present day.

{¶33} Mr. Jones's oldest sister also testified about his childhood. She confirmed that he was picked on a lot because of his eye, that he had learning difficulties that led to low self-esteem, and that he attempted to commit suicide by drinking gasoline when he was seven or eight. She also confirmed that there was domestic violence between her parents and that she and her siblings used drugs and got involved in criminal activity, which Mr. Jones was exposed to from a young age. She testified, however, that Mr. Jones's eye was corrected when he was only two or three. She also testified that their parents took good care of them, took them to church, and taught them right from wrong and that all of the siblings have remained close and supportive of each other over the years.

{¶34} Besides calling witnesses to testify about his childhood, Mr. Jones's lawyers also called his children, the mother of his children, a close friend, and two of his former ministers to describe the positive effect Mr. Jones has had on others. Mr. Jones also made an unsworn statement reiterating many of the facts recounted by the other witnesses.

**{¶35}** In his petition, Mr. Jones argued that, if his lawyers had done a more thorough investigation of his childhood, they would have discovered that the challenges he faced were more serious than divorced parents, domestic violence, and teasing over a wandering eye. Mr. Jones submitted a report by Dr. Bob Stinson, a psychologist, in which he criticized Mr. Jones's defense team for not discovering that he had been sexually abused by two of his brothers. That abuse allegedly lasted from before he was old enough to go to school until he was 12 years old. It began with his brothers fondling him, progressed to them performing oral sex on him, and eventually to him performing oral sex on them. Mr. Jones submitted an affidavit from his oldest sister who partially substantiated those claims, asserting that, when their oldest brother was released from prison, he confronted Mr. Jones and another brother in the attic and tried to have anal sex with them. While Mr. Jones was able to elude capture, the other brother was not. According to Mr. Jones's sister, Mr. Jones was in the attic with his brothers while the oldest one raped the other one.

**{¶36}** In her affidavit, Mr. Jones's oldest sister described other incestuous conduct that occurred in their childhood home that was not presented at Mr. Jones's trial. According to her, their father attempted to molest one of her sisters and her and put his penis inside another sister's mouth while the sister was sleeping. She asserted that, even though Mr. Jones was the youngest in the family, he was aware of the sexual contact between his father and sisters. Mr. Jones submitted affidavits from the two other sisters that his father molested or attempted to molest, verifying the oldest sister's claims. Mr. Jones's mother also submitted an affidavit, asserting that she discovered that her husband had molested her daughters when she went looking for missing kitchen knives and found them under her daughters' pillows. Although the daughters explained

to her that they had the knives to protect themselves from her husband, she did not contact the police.

{¶37} Dr. Stinson also criticized Mr. Jones's lawyers for not eliciting details about the domestic violence that had occurred in Mr. Jones's childhood home. While Dr. Siddall testified that Mr. Jones's parents fought, he did not describe any incidents in detail. Dr. Stinson said that he learned that the father broke Mr. Jones's mother's shoulder and nose, hit her in the head with a frying pan, gave her black eyes, kicked her in the face, and swung an ax at a man with whom she was having an affair. He also learned that several of the children got "whoopings" that resulted in welts and bruises, that Mr. Jones's mother called Mr. Jones "stupid," and that, after Mr. Jones was discovered having sex with a boy from the neighborhood, admonished him that he was not allowed to become a "faggot."

{¶38} Dr. Stinson also criticized Mr. Jones's lawyers for allowing Mr. Jones's father to be portrayed as a decent role model, even though he was emotionally, physically, and sexually abusive to his wife and children, squandered family assets, and abused illicit drugs. He criticized Dr. Siddall for not accurately portraying Mr. Jones's mental health history and improperly conceding that Mr. Jones only made suicide attempts after he got in trouble for something. He also criticized Mr. Jones's lawyers for not submitting Mr. Jones's medical records, which would have documented Mr. Jones's long struggle with mental illness and verified that those issues began well before he came into contact with the criminal justice system. According to Dr. Stinson, this would have rebutted the State's implication that Mr. Jones exaggerated his symptoms in order to receive attention and enjoy more favorable treatment. The records would also have established that Mr. Jones's corrective eye surgery occurred when he was 17, not 12 as his mother had remembered or 2 or 3 as his sister had remembered. Dr. Stinson further criticized

Mr. Jones's defense team for not recognizing that he has possible neurological or neuropsychological deficits that should have lead to an appropriate evaluation and for not using published psychological research to illustrate a connection between Mr. Jones's history and his anti-social behavior. According to Dr. Stinson, Mr. Jones's diagnosis should be schizoaffective disorder. Finally, he criticized Dr. Siddall for not spending enough time with family members or reviewing Mr. Jones's case. Dr. Stinson opined that it can take time for family members to become comfortable enough with an investigator to divulge deep family secrets such as sexual abuse.

{¶39} Although Dr. Siddall testified about Mr. Jones's background, he was not the primary investigator of Mr. Jones's family history. According to Dr. Siddall, that task was performed by Thomas Hrdy, a social worker. In his petition, Mr. Jones submitted an affidavit of a mitigation specialist, who asserted that Mr. Hrdy's mitigation investigation was inadequate. She criticized Mr. Hrdy for not spending much time with Mr. Jones's family members and for not meeting them in appropriate settings. According to the specialist, it is important to speak with family members separately, but some of the few hours Mr. Hrdy spent with Mr. Jones's family were while the family was watching football together. While Mr. Hrdy met individually with Mr. Jones's family members that day for 20-30 minutes each in an adjacent room, the specialist explained that it usually takes that much time just to describe to family members the role of a mitigation investigator and the purpose of the investigation. She also criticized Mr. Jones's defense team for not seeking appointment of a mitigation expert earlier, noting that Mr. Hrdy was not appointed till after voir dire had begun and did not begin any work on Mr. Jones's case until a week into the trial, preventing Mr. Jones's lawyers from asking relevant questions during jury selection. The specialist further noted that, while she usually spends 100 to 500

hours conducting an investigation, Mr. Hrdy billed for only 38 hours and that only 10 of those were spent interviewing family members. According to the specialist, 10 hours is not enough time to gather specific anecdotal evidence for trial.

{¶40} The trial court rejected Mr. Jones's petition, finding that his lawyers presented a meaningful concept of mitigation even if Dr. Siddall and Mr. Hrdy failed to obtain all the information necessary for their evaluation. It noted that, except for the incest allegations, the affidavits of Mr. Jones's family members were merely cumulative of evidence that was presented at trial. It also noted that there were no allegations that Mr. Jones's father made sexual advances toward him and that Mr. Jones's sisters did not indicate how they knew that Mr. Jones was aware of his advances toward them. It further noted that Mr. Jones did not mention incest while making his unsworn statement to the jury and that, if anyone could have informed his defense team about that history, it was Mr. Jones.

{¶41} Regarding Dr. Siddall and Mr. Hrdy's investigation, the trial court determined that, contrary to the social worker's allegations that Mr. Hrdy did not spend enough time building a rapport with Mr. Jones's family members, the depth and detail of Dr. Siddall's testimony, which included intimate and potentially embarrassing facts about their family life, demonstrated that he and Mr. Hrdy had thoroughly interviewed Mr. Jones's family. It determined that Mr. Jones's lawyers were not ineffective just because his family members did not disclose the incest in his family until more than two years after his trial. It further determined that it was speculative to assume that the incest testimony would have had an effect on the jury's decision.

{¶42} Regarding whether Mr. Jones's lawyers should have investigated possible neurological damage, the trial court explained that, just because another expert had a different

opinion than Dr. Siddall, it did not mean his lawyers were ineffective for relying on Dr. Siddall's opinion. Regarding whether Mr. Jones's lawyers should have requested a continuance to prepare for the mitigation phase, the court noted that, except for the allegations of incest, the investigators uncovered all of the potentially mitigating family history details. Finally, regarding whether Mr. Jones's lawyers should have submitted his medical records, it concluded that they were merely cumulative of Dr. Siddall's testimony.

{¶43} In his appellate brief, Mr. Jones has argued that his lawyers were ineffective because they failed to discover the history of incest and sexual abuse in his family, presented an incomplete psychological assessment, failed to secure enough time to discover such information, and did not discover or present documents corroborating his life history. Citing the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, he has argued that their mitigation investigation was deficient under prevailing professional standards.

{¶44} In *Strickland v. Washington*, 466 U.S. 668, 691 (1984), the United States Supreme Court held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." It explained that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Accordingly, to the extent that Mr. Jones has argued that his lawyers' mitigation investigation was deficient; our focus is on whether it was reasonable under prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); see *State v. Herring*, 7th Dist. No. 08-MA-213, 2011-Ohio-662, at ¶83 ("Without a full picture of appellant's upbringing and family life, counsel could not have made an informed, strategic decision about what mitigation evidence to present to the jury.").

**{¶45}** In *Wiggins*, the United States Supreme Court noted that it had long referred to the American Bar Association standards as "guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). It also noted that, under the American Bar Association's guidelines for capital defense work, a lawyer should make efforts to discover all reasonably available mitigating evidence. *Id.* It characterized that rule as a "well-defined norm[]." *Id.*

**{¶46}** In *Bobby v. Van Hook*, __ U.S. __, 130 S. Ct. 13 (2009), the United States Supreme Court clarified that the American Bar Association standards are "'only guides' to what reasonableness means, not its definition." *Id.* at 17 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). It held that the Sixth Circuit incorrectly applied the American Bar Association's 2003 guidelines to evaluate whether Mr. Van Hook's lawyers acted reasonably in 1985 and incorrectly treated those guidelines as "inexorable commands." It left open the possibility that the 2003 guidelines could be applied more categorically regarding post-2003 representation so long as they reflected prevailing norms of practice and were not "so detailed that they would 'interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.'" *Id.* at ¶17 n.1 (quoting *Strickland*, 466 U.S. at 689); see also *id.* at 16 ("Restatements of professional standards . . . can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.") (quoting *Strickland*, 466 U.S. at 688).

**{¶47}** Although Dr. Siddall's invoice indicates that he began meeting with Mr. Jones's lawyers six weeks before trial, it is troubling that he spent less than eight hours conducting interviews and tests before Mr. Jones's trial began. It is more troubling that Mr. Hrdy, the social

worker who Dr. Siddall said was responsible for interviewing Mr. Jones's family members, did not begin any work on his case until a week into the trial. The American Bar Association guidelines advise lawyers to begin "[t]he mitigation investigation . . . as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1023 (Summer 2003). The guidelines also advise lawyers to "devote substantial time to . . . choosing a jury most favorable to the theories of mitigation that will be presented." *Id*. at 1051. "Ideally, 'the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation." *Id*. at 1059 (quoting Andrea D. Lyon, Defending the Death Penalty Case: What Makes Death Different?, 42 Mercer L. Rev. 695, 711 (1990)). If Mr. Jones's defense team did not do much mitigation investigation by the time the trial started, they could not have formed an appropriate trial or mitigation theory. See *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (concluding that counsel's sentencing phase representation fell short of professional standards, in part, because they "did not begin to prepare for that phase of the proceeding until a week before the trial.").

{¶48} In *State v. Herring*, 7th Dist. No. 08-MA-213, 2011-Ohio-662, Mr. Herring's lawyers failed to secure a mitigation specialist until two weeks before the trial, meaning that "no investigation was complete by the time counsel were choosing a jury." *Id*. at ¶50. At an evidentiary hearing on Mr. Herring's petition for post-conviction relief, his lawyers "conceded that they should have had an idea of what their mitigation theme would be before starting voir dire." *Id*. Their failure to form a mitigation theme before starting voir dire was one of the

grounds that the Seventh District relied on in concluding that Mr. Herring's petition for post-conviction relief should have been granted. *Id*. at ¶90, 94. In this case, the trial court did not address the mitigation specialist's opinion, which Mr. Jones incorporated into his petition, that a mitigation expert should have at least three months to conduct an investigation before voir dire begins.

**{¶49}** This Court is also concerned about the amount of time Mr. Hrdy spent investigating Mr. Jones's background. While Mr. Hrdy uncovered most of the potentially mitigating circumstances of Mr. Jones's childhood, he did not learn about the sexual abuse that Mr. Jones allegedly suffered or the other incestuous conduct that allegedly occurred in his home. In light of the fact that it was Mr. Jones's rape of Ms. Yates that resulted in the capital specification, details about deviant sexual conduct that Mr. Jones endured or was exposed to as a youth would have been more relevant to his defense than his parent's divorce or his abnormal eye. The trial court failed to consider whether the weight the jury would have given to such facts was more significant than the weight they gave to the mitigating evidence that was presented.

**{¶50}** The trial court discounted the mitigation specialist's opinion that Mr. Hrdy did not spend enough time to build a rapport with Mr. Jones's family because Dr. Siddall's testimony was able to provide "many intimate and potentially embarrassing details about [Mr.] Jones's family life." In addition to details about Mr. Jones's grandparents and his deceased father, those details were that Mr. Jones's mother was separated from her sister as a child, that she grew up in foster care, that she had some history of alcohol abuse, that Mr. Jones's siblings battled drug and alcohol addictions, that his siblings had serious psychiatric disorders such as bipolar disorder and schizophrenia, and that there was domestic violence in their family home. The question, however, is not whether Dr. Siddall and Mr. Hrdy uncovered some intimate details of Mr.

Jones's family life, but whether the investigation conducted by Mr. Jones's defense team was "extensive and generally unparalleled." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1022 (Summer 2003) (quoting Russell Stotler, Mitigation Evidence in Death Penalty Cases, The Champion, Jan./Feb. 1999, at 35).

{¶51} Mr. Hrdy began work on Mr. Jones's case on December 10, 2007. Mr. Jones's sentencing hearing began on January 10, 2008. Accordingly, by the time Mr. Hrdy began his investigation, he had only one month to review Mr. Jones's records, set up appointments with Mr. Jones and his family members, conduct interviews, and report his findings to Dr. Siddall and Mr. Jones's lawyers in enough time for them to prepare for trial. The American Bar Association guidelines recognize that it is "the role of lead counsel . . . to direct the work of the defense team in such a way that, overall, it provides high quality legal representation in accordance with . . . professional standards." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1002 (Summer 2003). The fact that Mr. Hrdy was able to spend only 10 hours interviewing Mr. Jones's family members and had to conduct some of those interviews while the family was gathered to watch football, therefore, can be attributed to Mr. Jones's lawyers' failure to have him begin working on the case earlier and their failure to request a continuance before the sentencing phase of the trial.

{¶52} The American Bar Association guidelines emphasize that counsel has a duty to thoroughly investigate a defendant's background "regardless of the expressed desires of a client." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1021 (Summer 2003). The fact that

Mr. Jones, himself, could have told his lawyers about the sexual abuse he suffered as a child does not excuse their failure to conduct a complete investigation into "anything in the life of [the] defendant which might militate against the appropriateness of the death penalty for that defendant." *Id*. at 1022 (quoting *Brown v. State*, 526 So. 2d 903, 908 (Fla. 1988)). The Guidelines specifically note that "[f]amily and social history (including physical, sexual, or emotional abuse . . . )" is a topic that "[c]ounsel needs to explore." *Id*.

**{¶53}** Mr. Jones's oldest sister asserted that the mitigation investigator did not spend much time with her and did not ask her much about the family's background or for details about incidents. The sister who had been molested by Mr. Jones's father asserted that no one from Mr. Jones's defense team ever contacted her. Similarly, a nephew of Mr. Jones asserted in an affidavit that no one asked him about the family, even though one of the lawyers who represented Mr. Jones also represented him regarding an aggravated robbery charge. Mr. Jones's mother asserted that Mr. Jones's lawyers did not explain mitigation well and did not prepare her to testify.

**{¶54}** Considering the allegations presented by Mr. Jones and his family members and our serious concerns about the timing and extent of Mr. Jones's lawyers' mitigation investigation and the reasonable probability that, if the alleged incestuous conduct had been discovered, it would have substantially changed his lawyers' mitigation strategy, we believe that the trial court should have held a hearing on Mr. Jones's penalty-phase ineffective assistance of counsel claims. *State v. Calhoun*, 86 Ohio St. 3d 279, 283 (1999) ("[B]efore a hearing is granted, 'the petitioner bears the initial burden to submit evidentiary documents containing *sufficient operative facts* to demonstrate the lack of competent counsel *and* that the *defense was prejudiced* by counsel's ineffectiveness.'") (quoting *State v. Jackson*, 64 Ohio St. 2d 107, 112 (1980)); see *State v.*

*Tenace*, 109 Ohio St. 3d 255, 2006-Ohio-2417, at ¶102-06 (explaining that evidence that defendant was made to watch the sexual abuse of his sister and that he was sexually abused himself were among the other factors that led the Court to conclude that death penalty was not appropriate). To the extent that Mr. Jones's first assignment of error is that the trial court should have held a hearing to determine whether his lawyers were ineffective regarding the penalty-phase of this trial, it is sustained.

## JUROR MISCONDUCT

{¶55} Mr. Jones also argued in his petition that he was deprived of his right to a fair trial because the jury failed to follow the instructions of the trial court. He noted that the court told the jury that the only aggravating circumstance that it could consider in determining whether to recommend death was the rape of Ms. Yates. He submitted an affidavit from a lawyer who interviewed one of the jurors after the trial, asserting that the juror told him that the aggravating circumstances that compelled him to vote for death were the testimony of a woman who Mr. Jones previously raped and the fact that he thought Mr. Jones had lied about the crime. The juror also reportedly said that he had talked to his wife about the case, in violation of the court's instructions.

{¶56} Mr. Jones argued in his petition that the juror's statements demonstrate that the jury did not understand the concept of aggravating circumstances and the process of weighing them with mitigating circumstances. He further argued that they demonstrate that Ohio's death penalty scheme is defective and unconstitutional.

{¶57} The trial court rejected the lawyer's affidavit as hearsay. It also noted that, under Rule 606(B) of the Ohio Rules of Evidence, a juror may not testify "as to any matter or statement occurring during the course of the jury deliberations or to the effect of anything upon that or any

other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . .
or concerning the juror's mental processes in connection therewith."

{¶58} In his appellate brief, Mr. Jones has acknowledged that Evidence Rule 606(B) sets forth Ohio's aliunde rule. *State v. Hessler*, 90 Ohio St. 3d 108, 123 (2000). The purpose of the rule is "to maintain the sanctity of the jury room and the deliberations therein." *Id*. The Ohio Supreme Court has explained that the rule "requires a foundation from nonjuror sources" and that the "information [alleging misconduct] must be from a source which possesses firsthand knowledge of the improper conduct." *Id*. (quoting *State v. Schiebel*, 55 Ohio St. 3d 71, 75 (1990)). Applying the rule, it has held that a criminal defendant "does not have a constitutional right to know the nature of jury discussions during deliberations." *State v. Mason*, 82 Ohio St. 3d 144, 167-68 (1998). While Mr. Jones has asked that we reconsider whether the aliunde rule violates his constitutional rights, we have no power to reconsider a decision of the Supreme Court. We conclude that the trial court correctly determined that Evidence Rule 606(B) prohibits Mr. Jones from relying on hearsay statements of a juror to support his claims for relief.

## RES JUDICATA

{¶59} Mr. Jones also argued in his petition that the trial court incorrectly allowed a woman he raped in 1990 to testify about that incident. According to Mr. Jones, her testimony persuaded the jurors to convict him of rape and aggravated murder and to favor the death penalty. The trial court denied his claim because he had raised a similar one in his direct appeal.

{¶60} In his brief, Mr. Jones has argued that the claims are different because the one he made in his petition relied on evidence outside the record. The evidence Mr. Jones relied on were statements that a juror allegedly made after the trial about the effect the victim's testimony

had on the jury. Mr. Jones has argued that the juror's statements overcome the presumption that the jury followed the trial court's instructions.

**{¶61}** As discussed above, the evidence that Mr. Jones submitted in support of his other acts claims is prohibited under Rule 606(B) of the Ohio Rules of Evidence. *State v. Hessler*, 90 Ohio St. 3d 108, 123 (2000). Under that rule, "any statement by the juror concerning a matter about which the juror would be precluded from testifying will not be received[.]" Evid. R. 606(B). We conclude that, because the trial court was prohibited from considering the affidavit submitted by Mr. Jones, it correctly determined that his other acts claims are barred by res judicata. *State v. Perry*, 10 Ohio St. 2d 175, paragraph nine of the syllabus (1967); *State v. McKnight*, 4th Dist. No. 07CA665, 2008-Ohio-2435, at ¶51 (concluding aliunde rule prohibited trial court from considering affidavit when evaluating defendant's post-conviction relief petition); *State v. Johnson*, 5th Dist. No. 2006-CA-04, 2007-Ohio-1685, at ¶59 (noting that incompetent evidence is not properly considered in post-conviction relief petition). To the extent that Mr. Jones's first assignment of error is that the trial court incorrectly denied his petition for post-conviction relief because it incorrectly allowed other acts evidence to be presented and because of juror misconduct, it is overruled.

## NEUROLOGICAL TESTING

**{¶62}** Mr. Jones's second assignment of error is that the trial court incorrectly refused to grant him funds to hire a neurological expert. Mr. Jones moved for the funds because the mitigation specialist noted several factors from his background that suggested neuropsychological defects. He argued in his motion that Dr. Siddall's conclusion that he did not have any neuropsychological problems was unreasonable. He also argued that neurological testing is needed to support his post-conviction relief petition. The trial court denied his motion

because Section 2953.21 does not provide a right to expert funding and because the psychological testing Dr. Siddall previously conducted did not suggest that Mr. Jones is mentally retarded.

**{¶63}** Mr. Jones has argued that, since Dr. Stinson recommended that he receive a neuropsychological evaluation, it is a violation of his constitutional rights to deny him funds to receive such testing. He has argued that he should have an equal right to present his post-conviction relief claims, even though he can not afford the tests himself.

**{¶64}** In *State v. Smith*, 9th Dist. No. 98CA007169, 2000 WL 277912 (Mar. 15, 2000), this Court reasoned that, because "the right to the assistance of experts stems from the right to counsel" and "a post-conviction petitioner has no constitutional right to counsel," "a post-conviction relief petitioner has no constitutional right to the funding of experts." *Id.* at *3. Mr. Jones has not persuaded us to reconsider our precedent. Accordingly, since Mr. Jones does not have a constitutional right to the post-conviction funding of experts, we conclude the trial court did not err when it denied his motion for neurological testing. Mr. Jones's second assignment of error is overruled.

DISCOVERY

**{¶65}** Mr. Jones's third assignment of error is that the trial court incorrectly denied his motion for discovery. This Court has repeatedly held that a petitioner does not have a right to discovery in a post-conviction relief proceeding under Section 2953.21 of the Ohio Revised Code, most recently in *State v. Craig*, 9th Dist. No. 24580, 2010-Ohio-1169, at ¶6. See also *State v. Smith,* 9th Dist. No. 24382, 2009-Ohio-1497, ¶18; *State v. Smith*, 9th Dist. No. 04CA008546, 2005-Ohio-2571, at ¶20; *State v. McNeill*, 9th Dist. No. 01CA007800, 2001 WL 948717 at *5 (Aug. 22, 2001). Mr. Jones has argued that the denial of discovery violates his

constitutional rights. State collateral review, however, is not a constitutional right. *State v. Calhoun*, 86 Ohio St. 3d 279, 281 (1999). "Therefore, a petitioner receives no more rights than those granted by statute." *Id*. Mr. Jones's third assignment of error is overruled.

CONCLUSION

**{¶66}** The trial court correctly denied Mr. Jones's petition for post-conviction relief regarding his guilt-phase ineffective assistance of counsel claims, his other acts evidence claims, and his juror misconduct claims. It also correctly denied his motions for discovery and neurological testing. The court exercised improper discretion when it denied Mr. Jones's penalty phase ineffective assistance of counsel claims without holding a hearing to determine whether his lawyers began their mitigation phase investigation early enough and whether they allowed Dr. Siddall and Mr. Hrdy enough time to do a complete investigation into Mr. Jones's family life. The judgment of the Summit County Common Pleas Court is affirmed in part and reversed in part, and this matter is remanded to the trial court for proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
CLAIR E. DICKINSON
FOR THE COURT

CARR, P. J.
CONCURS IN JUDGMENT ONLY, SAYING:

**{¶67}** I concur in the judgment and most of the opinion. I write separately because I disagree with the extensive application of the American Bar Association Guidelines in the discussion of penalty-phase ineffective assistance of counsel.

**{¶68}** The majority correctly sets forth the standard this Court must apply – did the trial court abuse its discretion when it denied the petition without a hearing? I agree with the majority that the trial court abused its discretion in denying the petition without a hearing because Jones "set forth sufficient operative facts to establish substantive grounds for relief." *State v. Calhoun* (1999), 86 Ohio St.3d 279, paragraph two of the syllabus. In support of this conclusion, however, the majority relies exclusively on the ABA Guidelines in evaluating the conduct of defense counsel. The United States Supreme Court has made clear that the Guidelines "are 'only guides' to what reasonableness means, not its definition." *Bobby v. Van Hook* (2009), 130 S.Ct. 13, 17. The Court concluded "that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." Id. The majority's analysis of this issue, however, gives greater weight to the Guidelines than they are due.

{¶69}  Because Jones set forth sufficient operative facts to establish substantive grounds for relief, I agree with the majority's conclusion that the trial court abused its discretion in denying the petition without a hearing.  The detailed analysis of this claim should be done in the first instance by the trial court, after a hearing, and without exclusive reliance on the ABA Guidelines, or any other guide for that matter, but rather on the requirement imposed by the United States Constitution – did trial counsel make objectively reasonable choices?  *Van Hook*, 130 S.Ct. at 17.

WHITMORE, J.
CONCURS IN JUDGMENT ONLY, SAYING:

{¶70}  I concur in judgment only.  Although I agree with the outcome reached in the lead opinion, I agree with Judge Carr's position that it relies too heavily upon the American Bar Association Guidelines.  In my view, reliance upon the Guidelines should be restricted to those few cases where there is little or no primary authority available.  As such, I concur in the judgment only.

APPEARANCES:

KIMBERLY RIGBY and ROBERT BARNHART, Assistant State Public Defenders, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.