[Cite as *State v. Jones*, 2019-Ohio-289.]

STATE OF OHIO      )            IN THE COURT OF APPEALS
                    )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT   )

STATE OF OHIO                  C.A. No.     28063

     Appellee

     v.                          APPEAL FROM JUDGMENT
                                ENTERED IN THE
PHILLIP JONES               COURT OF COMMON PLEAS
                                COUNTY OF SUMMIT, OHIO
     Appellant              CASE No.    CR 2007 04 1294

## DECISION AND JOURNAL ENTRY

Dated: January 30, 2019

---

SCHAFER, Presiding Judge.

{¶1} Defendant-Appellant, Phillip Jones, appeals the judgment of the Summit County Court of Common Pleas denying his petition for post-conviction relief. For the reasons that follow, we affirm.

I.

{¶2} Jones was sentenced to death for the rape and murder of S.Y. The Supreme Court of Ohio affirmed Jones's convictions and sentence of death in *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 267 ("*Jones I*"). However, prior to the release of the Supreme Court's decision in *Jones I*, Jones filed a timely petition for post-conviction relief. Jones submitted multiple arguments for relief including that his trial counsel was ineffective during the mitigation phase of his trial. The trial court denied his petition without holding an evidentiary hearing.

{¶3} On a previous appeal, this Court outlined the substantive facts and relevant procedural history as follows:

On the morning of April 23, 2007, a man was jogging through a cemetery when he discovered [S.Y.]'s body lying near some headstones. According to the county medical examiner, she had bruises on her head, external and internal neck injuries, and eye and facial petechia (spots caused by the breaking of small blood vessels). She was dressed in multiple layers, including a summer dress and denim skirt. Several buttons were missing from the dress and were lying in the road. The skirt had a slit, but it had been torn apart even more from where the slit had ended. [S.Y.]'s bra was also torn between the cups and there was a small, plastic, glow-in-the-dark cross lying over one of her eyes.

The medical examiner concluded that [S.Y.]'s cause of death was asphyxia by strangulation and that the manner of her death was homicide. He also concluded that [S.Y.] had been vaginally and anally raped. A couple of days after [S.Y.]'s body was found, Mr. Jones's wife told the police that Mr. Jones was the one who killed her. Mr. Jones's semen was found on [S.Y.]'s skirt and on a vaginal swab. The cross that had been found over [S.Y.]'s eye was similar to one that Mr. Jones had given to his wife a year earlier.

The Grand Jury indicted Mr. Jones for aggravated murder, murder, and rape. He was arraigned on May 15, 2007. In August 2007, the court determined that Mr. Jones was competent to stand trial and set a trial date for December 3. On October 22, the Grand Jury issued a supplemental indictment, adding death penalty and repeat offender specifications. Mr. Jones was arraigned on the supplemental indictment two days later.

At the October 24 arraignment, Mr. Jones's lawyers acknowledged that a mitigation investigation normally "takes several months," but did not move for a continuance. Instead, they said that they had agreed with the prosecutor to keep the December 3 trial date. They also suggested scheduling two or three days in January 2008 for the penalty phase of the trial, if it proved necessary. At the hearing, Mr. Jones's lawyers also presented the court with an order allowing them to retain Dr. James Siddall, a psychologist, so that he could begin conducting interviews and testing for mitigation purposes. The court signed the proposed order that same day. According to the statement Dr. Siddall submitted after trial, between October 24, 2007, and January 8, 2008, he spent four and a half hours consulting with Mr. Jones's lawyers. His statement also indicated that on November 21 and December 12 he did a total of 7.75 hours of "[i]nterviews and testing."

On November 1, Mr. Jones's lawyers moved for appropriation of funds to hire a defense mitigation expert. At a hearing on November 15, the court granted the motion and ordered Mr. Jones's lawyers to prepare an entry appointing Thomas Hrdy as that expert. While the record does not indicate when Mr. Jones's lawyers submitted a proposed entry, the trial court entered an order appointing Mr. Hrdy on December 5. According to the invoice Mr. Hrdy submitted after trial, he began working on Mr. Jones's case on December 10.

> According to the affidavits submitted by Mr. Jones's family members, either Mr. Hrdy did not spend much time with them asking about their family background or no one from Mr. Jones's defense team attempted to speak with them at all. According to Mr. Hrdy's invoice, on December 20, he spent 3.5 hours interviewing Mr. Jones's mother and his oldest sister. On December 23, he spent 4.5 hours "[m]eeting w/ family @ [Mr. Jones's mother's] home." On January 2, he billed 2 hours for "[i]nterview w/ family, drop off records (Siddall)." Finally, on January 5, he billed 4 hours for "[m]eeting w/ family, atty." There is no additional detail in the record regarding which "family" members he met or how he divided his time between the two activities listed on each of the January dates.

*State v. Jones*, 9th Dist. Summit No. 25695, 2011-Ohio-6063, ¶ 2-7 (*Jones II*).

{¶4} Ultimately, this Court affirmed the trial court's decision in part but reversed and remanded for further proceedings on Jones's claim of ineffective assistance of counsel during the mitigation phase of his trial. *See id.* In so doing, we specifically determined that the trial court had "exercised improper discretion when it denied Mr. Jones's penalty phase ineffective assistance of counsel claims without holding a hearing to determine whether his lawyers began their mitigation phase investigation early enough and whether they allowed Dr. Siddall and Mr. Hrdy enough time to do a complete investigation into Mr. Jones's family life." *Id*. at ¶ 66.

{¶5} Upon remand, the trial court held an evidentiary hearing and issued a lengthy decision dismissing Jones's petition for post-conviction relief. In the trial court's decision, the court acknowledged that trial was before the court's predecessor judge, noting that the trial court read the trial transcripts from the mitigation phase and referred to the Supreme Court of Ohio's summarization of the mitigation testimony that was presented during the mitigation phase in *Jones I*. In denying Jones's petition, the trial court explicitly found that Jones's trial counsels' assistance was reasonable "[i]n light of the variety of circumstances faced by [his] trial counsel and the range of legitimate decisions regarding how best to represent him." Further, with regard to any prejudicial affect that the alleged ineffective assistance of counsel may have had, the trial

court determined that in light of all of the evidence presented, the trial court could not conclude that the decision of the jury or of the trial judge would have been different.

{¶6} Jones subsequently filed this timely appeal, raising two assignments of error for our review.

II.

### Assignment of Error I

**The trial court erred by concluding that Jones did not receive ineffective assistance of counsel, when Jones's attorneys conducted their investigation after the trial began, did not allow their experts enough time to fully investigate Jones's background, and failed to discover sexual abuse endured by Jones as a child. [ ]**

{¶7} In his first assignment of error, Jones contends that the trial court erred when it determined that Jones did not receive ineffective assistance of counsel. Jones argues that his counsel was ineffective during the penalty mitigation phase of his trial because his attorneys conducted the mitigation investigation after Jones's trial had already begun, did not allow enough time for their experts to fully investigate Jones's background, and failed to discover sexual abuse Jones endured as a child. We disagree.

{¶8} R.C. 2953.21(A)(1)(a) provides that any person who has been convicted of a criminal offense may petition the court for post-conviction relief pursuant to a claim "that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." A trial court's denial of a petition for post-conviction relief after an evidentiary hearing is held is reviewed for an abuse of discretion. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 58. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Id*. at ¶ 60, quoting *State v. Adams*, 62

Ohio St.2d 151, 157. "[A] reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *Id.* at ¶ 58. However, while reviewing the record to determine if the trial court's findings are supported by competent credible evidence, we must keep in mind that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994), citing *Ostendorf-Morris Co. v. Slyman*, 6 Ohio App.3d 46, 47 (8th Dist.1982).

{¶9} In this case, the trial court employed the correct legal standard in resolving Jones's claim of ineffective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, Jones must demonstrate "(1) that his counsel's performance was deficient to the extent that 'counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment' and (2) that but for his counsel's deficient performance the result of the trial would have been different." *State v. Velez*, 9th Dist. Lorain No.13CA010518, 2015-Ohio-642, ¶ 18, quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, this court need not address both prongs of the *Strickland* test if it should find Jones failed to prove either prong. *State v. Ray*, 9th Dist. No. 22459, 2005-Ohio-4941, ¶ 10.

{¶10} Moreover, in Ohio, a properly licensed attorney is presumed competent and the burden of proof is on Jones to demonstrate that counsel was ineffective. *Gondor* at ¶ 62. Counsel in a capital case has the "'obligation to conduct a thorough investigation of the defendant's background' to determine the availability of mitigating evidence." *State v. Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, ¶ 69, quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000). "Counsel's 'investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."'" (Emphasis sic.) *Herring* at ¶ 69, quoting *Wiggins v.*

*Smith*, 539 U.S. 510, 524, quoting ABA *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 11.4.1(C). A trial counsel's performance will not be deemed ineffective unless it falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. "[T]he deference owed to counsel's strategic judgments about mitigation is directly proportional to the adequacy of the investigations supporting such judgments." *Herring* at ¶ 69, quoting *Jells v. Mitchell*, 538 F.3d 478, 492 (6th Cir.2008). Nonetheless, the Supreme Court of Ohio has specifically recognized that "'the finding as to whether counsel was adequately prepared does not revolve solely around the amount of time counsel spends on the case or the numbers of days which he or she spends preparing for mitigation. Instead, this must be a case-by-case analysis.'" *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 227, quoting *State v. Lewis*, 838 So.2d 1102, 1114, (Fla.2002), fn. 9.

## A. Timing of the Mitigation Investigation

{¶11} Jones first argues that the trial court erred when it concluded that his trial counsel were effective since his counsel had done limited mitigation investigation prior to the start of the trial and thus, could not have formed an appropriate trial or mitigation theory. We disagree for the following reasons.

{¶12} With regard to the timing of the mitigation investigation, the trial court made the following factual findings: the trial court authorized payment for defense counsel to retain Mr. Hrdy as an investigator two days after the start of jury selection; Jones's trial counsel did not ask the jurors questions pertaining to their theories of mitigation during jury selection; at the time jury selection began, Jones's trial counsel had information about Jones's background, education, family history, and mental health through competency evaluations, interviews and records;

Jones's trial counsel "had the benefit of having already received the information and points of view of two psychologists" prior to jury selection; Jones's trial counsel had Jones's statement to the arresting detective that the victim's death was an accident; during the trial phase, Jones's counsel presented a defense consistent with their client's statement to the arresting detective that the victim's death was an accident and had the defense been successful, the jury would never have considered the death penalty; defense counsel did not receive Dr. Siddall's written report until two days before the start of the mitigation phase; Jones's own mitigation expert testified that some cases are "mitigation cases right up front" and trial counsel needs the mitigation information during jury selection, but that expert did not see Jones's case as such.

{¶13} A review of the record on appeal shows that with the exception of the trial court's finding that Jones's trial counsel "had the benefit of having already received the information and points of view of two psychologists," the above findings were supported by competent credible evidence. However, as we discuss below, the trial court's unsupported finding that Jones's counsel had information and points of view of two psychologists was not determinative in this case.

### 1. Law of the Case

{¶14} Jones argues that "[u]nder the law of this case, defense counsel's performance was deficient." Jones bases this argument on a statement in *Jones II*, where this Court professed that "*[i]f* Mr. Jones's defense team did not do much mitigation investigation by the time the trial started, they *could not* have formed an appropriate trial or mitigation theory." (Emphasis added.) *Jones II*, 2011-Ohio-6063 at ¶ 47, citing *Williams*, 529 U.S. at 395. Jones supports this argument by pointing to the testimony of one his trial attorneys and the trial court's finding that defense counsel had not retained Mr. Hrdy until after jury selection had already begun. The testimony to

which Jones refers occurred on cross-examination during the post-conviction hearing where one of his trial attorneys agreed that "Dr. Siddall's work couldn't have really been completed in a meaningful way until Mr. Hrdy was involved in doing his role."

{¶15} "[T]he doctrine of the law of the case * * * establishes that the 'decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.'" *Hood v. Diamond Prod., Inc.*, 137 Ohio App.3d 9, 11 (9th Dist.2000), quoting *Pipe Fitters Union Local No. 392 v. Kokosing Constr. Co., Inc.*, 81 Ohio St.3d 214, 218 (1998). Consequently, "[a]n inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." *Id.* quoting *Nolan v. Nolan*, 11 Ohio St.3d 1 (1984), syllabus. However, Jones's argument that this Court's "if" statement is law of the case asks us to disassociate that statement not only from the rest of the paragraph in which it is contained, but also from our entire decision. The full paragraph reads as follows:

> Although Dr. Siddall's invoice indicates that he began meeting with Mr. Jones's lawyers six weeks before trial, it is troubling that he spent less than eight hours conducting interviews and tests before Mr. Jones's trial began. It is more troubling that Mr. Hrdy, the social worker who Dr. Siddall said was responsible for interviewing Mr. Jones's family members, did not begin any work on his case until a week into the trial. The American Bar Association guidelines advise lawyers to begin the mitigation investigation [ ] as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations. The guidelines also advise lawyers to devote substantial time to [ ] choosing a jury most favorable to the theories of mitigation that will be presented. Ideally, the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation. If Mr. Jones's defense team did not do much mitigation investigation by the time the trial started, they could not have formed an appropriate trial or mitigation theory.

(Internal quotations and citations excluded.) *Jones II* at ¶ 47. The use of the word "if" and the extensive application of the American Bar Association Guidelines confirm that this statement did

not create law of the case. Indeed, the United States Supreme Court had made clear "that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices" and that the ABA Guidelines "are 'only guides' to what reasonableness means, not its definition." *Bobby v. Van Hook*, 558 U.S. 4, 9 (2000) quoting *Strickland*, 466 U.S. 668 at 688.

{¶16} Moreover, the "if" statement and the entire paragraph in which it is contained are not necessary to the holding in *Jones II* wherein we concluded that the trial court had improperly denied Jones's petition for post-conviction relief without first holding a hearing. As such, the entire paragraph is dicta intended to give guidance to the trial court upon remand. "Dicta is not authoritative, and, by definition, cannot be the binding law of the case." *Gissiner v. Cincinnati*, 1st Dist. Hamilton No. C-070536, 2008-Ohio-3161, ¶ 15. Accordingly, the law of the case doctrine does not require us to conclude the defense counsel's performance was deficient.

## 2. Jury Selection

{¶17} Jones next argues that the trial court erred when it concluded that trial counsel's failure to ask about various mitigating factors during jury selection did not constitute ineffective assistance of counsel since counsel could not have made reasonable or strategic decisions because the mitigation investigation had barely begun.

{¶18} Regarding the information Jones's defense counsel had at the beginning of jury selection, the trial court stated that "[t]he evidence is clear that at the time voir dire began, defense counsel had information about [Jones]'s background, education, family history and mental health through competency evaluations, interviews and records. But they also had Petitioner's statement to the arresting detective that [S.Y.]'s death 'was an accident.'" The trial court further found that Jones's trial counsel "had the benefit of having already received the information and points of view of two psychologists" prior to jury selection. Although Jones

takes exception to the trial court's finding that his trial counsel had the benefit of information and opinions from two psychologists prior to jury selection, even assuming without deciding that the record does not support that finding, such a conclusion would not be determinative in this case.

{¶19} The Supreme Court of Ohio has "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.'" *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157 (1998). "'Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors.'" *Id.* at ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (C.A.6, 2001). "In some cases, asking few or no questions of a prospective juror 'may be the best tactic for a number of reasons.'" *Id.* at ¶ 65. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*." (Emphasis added.) *Strickland*, 466 U.S. at 691. The United States Supreme Court has stated the following:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Strickland* at 691, citing *United States v. Decoster*, 624 F.2d 196, 209-210 (D.C.Cir.1976).

**{¶20}** The trial court found that Jones's defense counsel had information about Jones's background, education, family history and mental health through competency evaluations interviews and records. Jones's counsel testified at the post-conviction hearing that they had incorporated information regarding Jones's family history, background, and mental health issues into the defense at both the trial and the mitigation phase. However, the trial court emphasized that during the trial phase, defense counsel presented a defense that was consistent with Jones's statement that S.Y.'s death was an accident. A review of the trial record shows that finding is supported by competent credible evidence. *See also State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677. At trial, Jones testified on his own behalf and stated that he and S.Y. had rough, but consensual sexual intercourse. He further stated that putting his hands around S.Y.'s throat was not his idea and "I guess it got too – went too far, applied too much pressure, and * * * it was an accident." Additionally, defense counsel reiterated the defense's theory of the case that S.Y.'s death was an accident during closing argument.

**{¶21}** The trial court went on to state in its journal entry that based on the defense's strategy and intention to show that S.Y.'s death was an accident, the court failed to see how the introduction of information about Jones's mental history and dysfunctional family background would assist in showing S.Y.'s death was an accident. The trial court stated this was especially true in light of the potential for "other acts" evidence the jury would hear as a result. Thus, the trial court determined that an attempt by trial counsel to limit questions focusing on the death penalty may have been a tactical decision. We note that during the post-conviction relief hearing, neither of Jones's defense counsel testified regarding the defense's strategy during jury selection nor were they asked any questions regarding that strategy on direct or cross-

examination. As the trial court applied the proper legal standard and its findings are support by competent, credible evidence, we cannot conclude that the trial court abused its discretion when it determined that asking potential jurors their views on mitigation was not essential to competent representation in this case.

{¶22} As Jones has failed to show that his trial counsel rendered deficient performance during jury selection we need not address whether Jones was prejudiced. *See Ray*, 2005-Ohio-4941 at ¶ 10.

## B. The Mitigation Investigation

{¶23} Jones contends that the amount of time spent on the mitigation investigation was inadequate. First, Jones argues that because Mr. Hrdy spent fewer than 10 hours interviewing Jones's family, Mr. Hrdy did not discover Jones's family's "history of severe and pervasive dysfunction." Specifically, Jones maintains that if Mr. Hrdy and his trial counsel would have conducted an adequate investigation they would have learned of rampant sexual abuse and additional physical and emotional abuse within the family. Second, Jones contends that Dr. Siddall had neither the time nor the information necessary to do a complete a psychological evaluation and make a diagnosis for the purposes of the mitigation hearing. Thus, the extent of Jones's mental illness was not discovered.

### 1. The Mitigation Investigation

{¶24} The trial court concluded that Mr. Hrdy's late start was not detrimental to Jones's mitigation investigation due to the nature and quality of the mitigation facts that the defense team was able to obtain, especially in light of the lengthy time that pre-existed the death penalty specification, during which there was the production of psychological reports, the development

of a rapport between Jones and his attorneys, and significant communication and information gathering with the Jones family.

{¶25} Ample information regarding the dysfunction of the Jones family was presented during the mitigation phase of Jones's trial. *See Jones I*, 135 Ohio St.3d 10, 2012-Ohio-5677 at ¶ 226-227, 249-250 ("Dr. Siddall testified that Jones grew up in a troubled family where there was domestic violence * * * that Jones's family has a history of psychiatric, substance-abuse, and criminal-justice problems * * * Jones's father committed domestic abuse and suffered from a learning disability. * * * In an unsworn statement, Jones stated that he had an abusive childhood. He witnessed domestic violence on numerous occasions, and his family abused alcohol and drugs. Jones also watched his siblings fight. His oldest brother stole cars and gave Jones marijuana when he was seven years old. Jones's parents divorced when he was eight. His mother left home, and Jones was then raised by his aunt, his grandmother, and his father. * * * After witnessing the abuse in his family, Jones started 'acting out' as a teenager.") However, on appeal, Jones argues that the trial court erred when it determined that his trial counsel was not ineffective for failing to discover further neglect as well as physical, emotional, and sexual abuse.

### a. Witnesses for the Defense

{¶26} At the evidentiary hearing on Jones's petition for post-conviction relief, Jones called twelve witnesses, five of whom testified as experts. Jones himself did not testify. Of the seven lay witnesses' who testified regarding Jones's history and background, the trial court found that "much of the lay-witnesses' testimony, at least that which can be corroborated and is credible, was cumulative to that which was already presented during mitigation." In support of

these conclusions, the trial court made the following observations regarding the lay-witnesses' and experts' testimony.

{¶27} Pastor Fuller, whose testimony the trial court found credible, stated that he was Jones's first cousin once removed and that he was the Jones family's pastor. As such, Jones called on him for pastoral care when Jones experienced trauma in his life. Although he did not testify at Jones's mitigation hearing, Pastor Fuller stated that a member of the defense team had questioned him about his pastoral relationship with Jones and that there "may have been other questions, but [he] did not recall." He further stated that he had been a part of a group of persons who had met with defense counsel when defense counsel defined mitigation and asked if the group had any questions about mitigation. Pastor Fuller believed he should have testified at the mitigation hearing, since he had more knowledge of the Jones's family history and dysfunction than the pastor who ultimately testified at Jones's mitigation hearing. Nonetheless, Pastor Fuller was not aware of mental illness or specific drug abuse within the family, except that he had "seen family members looking high." However, he did state that he became aware of "possible" sexual abuse in the family through Jones's sister, but that the discussion had occurred in his capacity as a pastor and privilege would have prevented him from revealing even the possibility of abuse to the mitigation team. Accordingly, the trial court determined that Pastor Fuller's testimony was merely cumulative of the testimony received at Jones's mitigation hearing.

{¶28} Pastor Hargrave testified at Jones's mitigation hearing and at the hearing on Jones's petition for post-conviction relief. The trial court found that he repeated much of the same testimony he had given during Jones's mitigation hearing. With regard to mitigation preparation, he testified that he had "at least two conversations by phone, perhaps a third. There was a large gathering, the family was there, I was there as well and I was called back into a room

individually with them * * * I talked about my role and the work that I do and my observations and I said I would like to help in any way that I could." Pastor Hargrave also testified about "significant disruption with boundaries, family boundaries, physical personal boundaries, for example bedroom space, what is borne outside the bedroom, and all of those things * * *." It was from this "boundaries" discussion with Jones's mother that Pastor Hargrave became aware of possible sexual abuse. However, he admitted that this conversation was not such that it caused him to feel compelled to make a police report under Ohio's mandatory reporting statute and that he would have been bound by privilege and not able to disclose the information to the mitigation team. The trial court found Pastor Hargrave to be credible, but noted that many of the opinions he presented regarding the dysfunction of the Jones family went beyond his role as a pastor and bordered on offering opinions and on issues beyond those for which he was qualified to testify.

{¶29} Rhonda Jones, one of Jones's sisters testified at the post-conviction relief hearing, but not during the mitigation phase. The trial court did not find Ms. Jones to be a credible witness. The trial court found that during her testimony, Ms. Jones was unfamiliar with the affidavit she executed as part of the evidence reviewed by this Court in *Jones II* and that during her testimony she denied making several of the statements contained within it. Ms. Jones did testify as to the dysfunction in the Jones family, such as having to steal food to survive, being physically and mentally abused by her parents, and of her parents' drug and alcohol abuse. However, Ms. Jones stated she was not familiar with any mental health issues in the Jones family. Ms. Jones stated that she was at her parents' house when Mr. Hrdy came for a meeting with the family, but that "he was more sitting there watching the game than talking."

{¶30} Concerning alleged sexual abuse in the Jones family, the trial court found that Ms. Jones testified that her father had tried to molest her and that there were persons dressed in skeleton costumes who fondled the Jones girls at night. In her affidavit attached to Jones's petition for post-conviction relief, Ms. Jones stated "[m]y father tried to molest me. Once when he tried to get into my bedroom, I blocked the door. My father broke in. I was 17 years old, and my boyfriend was there. My boyfriend beat up my father." Although Ms. Jones stated in her affidavit that she was 17 years old at the time of the alleged incident, she testified during the mitigation hearing that she was 16 years old, going on 17 and then subsequently testified that she was 17 years old at the time of the alleged incident. At the post-conviction hearing, the trial court found that Ms. Jones gave a vivid account of her naked, enraged father pounding on her barricaded bedroom door and trying to burst through. She escaped out the back and was kicked out of the house shortly thereafter. Although Ms. Jones characterized the incident as an attempt by her father to molest her, the trial court determined that there was no credible evidence that this event was an attempted molestation. Rather, the trial court concluded that the facts were far more consistent with a father who was enraged that his 16-year-old daughter had her boyfriend behind her locked bedroom door.

{¶31} Jones's niece, Sh'torie Harpster, did not testify during the mitigation phase, but did testify at the post-conviction relief hearing. The trial court found that she had testified that Jones was a father figure to her and that she further testified about the dysfunction in the Jones family, including mental illness and that Jones's brother had sexually abused her. Additionally, she stated that she was at the group meeting at her grandmother's house and had spoken to someone from the trial team, but thought her individual conversation with Mr. Hrdy could not have been longer than five minutes. She stated that no one from the defense team spoke to her

about sexual abuse. The trial court found Ms. Harpster's testimony to be merely cumulative of the testimony presented during Jones's mitigation hearing.

{¶32} Shain Harmel, Jones's nephew, did not testify at the mitigation hearing. The trial court found that Mr. Harmel testified during the post-conviction relief hearing that although he is not Jones's biological son, he had grown up thinking Jones was his father because Jones had treated him as such. The trial court found Mr. Harmel's testimony to be merely cumulative of the testimony presented during Jones's mitigation hearing.

{¶33} Yolanda Jones is Jones's sister. She testified at the mitigation hearing and during the post-conviction relief hearing. The trial court observed three significant points in her testimony: first, Ms. Jones testified about the abuse and dysfunction in the Jones family; second, she discussed rampant sexual abuse that she did not disclose during her mitigation testimony; and third, she testified that she had not been properly prepared for her testimony during the mitigation hearing. The trial court, however, found Ms. Jones's testimony to be "wholly unbelievable" based on her rehearsed demeanor and that her testimony was contradicted by evidence in the record.

{¶34} The trial court found that Ms. Jones's testimony concerning the dysfunction of the Jones family was the same or similar to her mitigation phase testimony. However, Ms. Jones presented some additional examples about the abuse in the family. Specifically, she added some details of her own abuse of Jones when he was a child and offered testimony which painted their mother in a poor light. The trial court found the testimony regarding alleged physical and mental abuse suffered by the Jones children at the hands of their mother contradicted the testimony Ms. Jones gave during the mitigation hearing. Although Ms. Jones claimed she was not given an opportunity to give the same detailed information during her mitigation hearing testimony, the

trial court found that during the mitigation hearing, Jones's defense counsel often guided Ms. Jones to specific subjects or instances that were helpful to mitigation and even asked her to give examples. Additionally, the trial court found that when the prosecutor asked Ms. Jones questions on cross-examination, that she asked many open-ended questions and did not cut Ms. Jones's testimony off at any point. The trial court also found that Jones's defense counsel asked questions during rebuttal that gave Ms. Jones the opportunity to clarify some of her responses during cross-examination.

{¶35} With regard to mitigation preparation, Ms. Jones stated she was never properly prepared for her testimony and that there were questions that were not asked during mitigation preparation or during the mitigation hearing. Nevertheless, Ms. Jones was not able to give any specifics of her mitigation preparation or lack thereof. Ms. Jones did admit that Mr. Hrdy had asked her about sexual abuse and that she understood at the time of Jones's mitigation hearing "that it was important to show that he came from an abusive, neglect (sic) family, where he was mistreated all his life." However, the trial court did not find her testimony about why she did not relate any of the abuse to the defense team to be credible.

{¶36} Christy Coffee testified that she was romantically involved with Mr. Jones. She testified at both the mitigation hearing and the hearing on post-conviction relief. The trial court found that her testimony at the post-conviction relief hearing was similar to the testimony she gave during the mitigation phase. However, Ms. Coffee gave additional testimony revealing that Jones's brother had raped her and that he, not Jones, was the father of her son.

{¶37} Ms. Coffee further stated that the only time she spoke with defense counsel prior to the mitigation hearing was with the Jones family at defense counsel's office. She stated that the attorneys asked about her relationship with Jones, but did not ask if she had children by his

brothers or if a paternity test had been done. She acknowledged that Mr. Hrdy had asked her open-ended questions about sexual abuse, but that she felt it was too quick. She further stated that she knew the attorneys had asked the Jones family about sexual abuse at the meeting "[b]ecause when the family came out that is what they were talking about, they talked about."

{¶38} Dr. Howard Fradkin is a psychologist with an expertise in the area of adult survivors of child sex abuse. He did not testify at the mitigation hearing. The trial court found that at the time of his post-conviction relief testimony, Dr. Fradkin had devoted thirty-four years of his practice to the area of adult survivors of child sexual abuse. He is also an advocate of the interviewing style called the Forensic Experiential Trauma Interview (FETI) which he believes is the most appropriate when interviewing trauma survivors. This form of interviewing did not come into existence until 2013. Dr. Fradkin opined that Jones is the survivor of male child sex abuse and that from the time of Jones's alleged suicide attempt at age six and for thirty years subsequent to that, medical professionals missed the diagnosis of sexual abuse. Dr. Fradkin further testified concerning prolific sexual abuse committed against Jones by Jones's brothers, Jones's sister's boyfriend, and Jones's stepmother. He attributed the defense team's failure to discover this horrific abuse to deficient mitigation investigation and methods. However, Dr. Fradkin also testified that the disclosure of sexual abuse "varies from person to person. It could take months. It could take years" and that "[m]ost men go to their graves without ever talking about [sexual abuse]."

{¶39} While admiring Dr. Fradkin's devotion to helping survivors of child sexual abuse, the trial court gave no weight to his testimony for a number of reasons. First, the trial court found it questionable that Dr. Fradkin's FETI interview method would survive a *Daubert* challenge, but even assuming it did, the trial court found that Dr. Fradkin's opinions were based

almost entirely upon the hearsay affidavits of family members whom Dr. Fradkin had never met or personally interviewed as well the self-serving statements of Jones, which were made in a setting in which Dr. Fradkin was not treating or diagnosing Jones. Second, the trial court found that Dr. Fradkin's report was "fraught with mischaracterizations of the evidence." These mischaracterizations were partly attributable to the fact that Jones's current counsel did not provide him with all of Jones's records and partly to the fact that he simply ignored the evidence he did have. Third, the trial court noted that although Dr. Fradkin referenced Jones's prison disclosure of sexual abuse by his father, Dr. Fradkin failed to reconcile Jones's non-disclosure of that abuse during his own FETI interview with Jones when Jones was sharing memories of abuse by at least five other people. Finally, the trial court found that Dr. Fradkin had conceded that he could not have testified to sexual abuse at a time when Jones and his family were denying its occurrence.

{¶40} Dr. Bob Stinson is an expert in forensic psychology. He testified at the post-conviction relief hearing, but not during the mitigation hearing. The trial court found that Dr. Stinson testified about the dysfunction and abuse with the Jones family. He personally interviewed Jones, but did not conduct any tests. In addition to the interview, Dr. Stinson relied upon the affidavits of family members and Dr. Fradkin's report. Dr. Stinson opined during his post-conviction relief testimony, that a review of Jones's medical records and school records indicate dysfunction that is consistent with a person who is sexually abused. The trial court found that Dr. Stinson remained firm in his opinion that the mitigation investigation should have uncovered the alleged sexual abuse at the time of the mitigation hearing. However, when offering his opinion about why the abuse was now being disclosed, he stated it may be "because the main perpetrator and person who said 'we do not talk about these things' ([Jones's mother])

eventually died." The trial court noted that Jones's mother was alive at the time of the mitigation hearing.

**{¶41}** Dorian Hall testified at the post-conviction hearing as an expert in the area of mitigation investigation. The trial court found that she has been employed by the Ohio Public Defender's Office since 1988 as a mitigation specialist and at the time of the post-conviction relief hearing supervised that office's mitigation specialists. Ms. Hall opined that an investigator must begin at least 90 days before jury selection in order to conduct a proper investigation and was critical of Mr. Hrdy's acceptance of the engagement to do work on Jones's case after jury selection had already begun. She was also critical of the amount of time Mr. Hrdy spent on the mitigation investigation, Mr. Hrdy's method of group interviewing, and of Mr. Hrdy's note keeping and record keeping. Ms. Hall further criticized the portrayal of Jones's father as a good role model during the mitigation phase and blamed the deficient detailed mitigation for allowing that portrayal.

**{¶42}** The trial court found Ms. Hall to be a professional and credible witness, but acknowledged that Ms. Hall's many years of employment with the Ohio Public Defender's Office gave the trial court cause to question her objectivity regarding her criticisms of Mr. Hrdy. Additionally, Ms. Hall was not able to comment on what Mr. Hrdy specifically did or did not do with regard to his mitigation investigation nor was she able to give any support for her opinion that a mitigation investigation should begin 90 days prior to jury selection. Although the trial court acknowledged that 90 days would be optimal, Ms. Hall also testified that "[g]enerally you need to spend as much time as you need to get all the information." The trial court found that although Ms. Hall criticized the lack of detailed, anecdotal information presented during the mitigation phase, that the additional anecdotal information Ms. Hall ultimately presented was

obtained solely from affidavits of Jones's family members. Thus, since she had not personally spoken to the family members, she had not been given the opportunity to assess their credibility. The trial court noted, however, that it "had the opportunity to do so with several of the witnesses who executed the affidavits upon which Ms. Hall relied and [] found their credibility questionable."

### b. Witnesses for the State

{¶43} In addition to Jones's witnesses, all four members of the defense mitigation team testified at the hearing for post-conviction relief. The trial court made the following observations about their testimony.

{¶44} Mr. Hrdy is a licensed social worker and part-time mitigation specialist. The trial court found that at the time of his testimony, Mr. Hrdy had finished his casework for his doctorate, was a member of the National Legal Defenders Association as a mitigation specialist, and has worked as a mitigation specialist since 1994. Mr. Hrdy admitted that he was engaged to work on Jones's case "late in the game." Excluding travel time, Mr. Hrdy spent approximately three hours with Jones and approximately ten additional hours with others, including family members and ministers. Mr. Hrdy spent additional time retrieving and reviewing records, meeting with Dr. Siddall and Jones's attorneys, and other casework. Mr. Hrdy stated he had no difficulty gathering information from Jones and found him to be cooperative. Mr. Hrdy also found the Jones family to be cooperative and forthcoming. Mr. Hrdy testified that he explained mitigation to the family and the fact that Jones was facing the death penalty. He felt that the family was able to provide him with information that was helpful to Jones's case. He further testified that he would not have specifically asked the family a leading question about sexual

abuse, but if anyone had indicated such, he would have noted it and provided that information to Dr. Siddall and Jones's attorneys.

**{¶45}** Mr. Hrdy testified that he met with many family members for four and a half hours at Jones's mother's home. He stated that he asked how the family preferred to be interviewed and that they preferred to be interviewed as a group. Mr. Hrdy acknowledged that a Cleveland Browns football game remained on the television during the interview, but with the volume turned down. Mr. Hrdy explained that he found advantages to the group interview because "a dynamic forms where someone will say something that will trigger a memory from someone else and you get a fuller interview." However, he did acknowledge that there could be some disadvantages such as someone not wanting to disclose personal information in a group setting or a stronger personality taking over, but that he always leaves his business card and asks the interviewees to call him if they remember anything else.

**{¶46}** Mr. Hrdy further testified that he had "enough and appropriate time to gather the records, interview the witnesses, assist the defense attorneys and Dr. Siddall in preparation of mitigation in this case." The trial court found this testimony very compelling since Mr. Hrdy had attested in an unrelated case about his mitigation investigation being substandard due to a lack of time to do an appropriate job. *See Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, ¶ 36-38. Mr. Hrdy's testimony combined with the amount and type of mitigating evidence produced during Jones's trial, together with the trial court's credibility evaluations of other witnesses, caused the trial court to accept Mr. Hrdy's statement that he had "enough and appropriate time to gather the records, interview the witnesses, assist the defense attorneys and Dr. Siddall in preparation of mitigation in this case" as true.

**{¶47}** Dr. Siddall is in an expert in forensic psychology and had testified as an expert in "maybe a dozen" capital mitigation hearings prior to Jones's case. The trial court found that he is licensed in both clinical and forensic psychology and also practices in the area of drug addiction. He has been licensed since 1975, is published and has received awards. At the time of his testimony, Dr. Siddall had taught graduate level courses, including courses on diagnosis. Although he is currently in private practice, Dr. Siddall has had significant experience with persons in a criminal legal setting through his work at a diagnostic clinic.

**{¶48}** Dr. Siddall stated that as a rule he would get records and complete his report before the start of trial, but in this case he completed his report after Jones's trial, but before the mitigation phase. Dr. Siddall visited Jones in the Summit County Jail on two occasions, spending about three and a half hours at each visit. The visits were divided equally between interviewing and testing Jones. In addition to documentary sources, Dr. Siddall relied on information from Jones and detailed family information he received from Mr. Hrdy. Dr. Siddall testified that he had enough time to complete the tasks he was assigned to do, but that he had also been aware that if he needed additional time, he would be able to ask for and receive more time. Dr. Siddall also testified that he asked Jones if he was sexually abused or if there was sexual abuse in the family. Jones denied both and Dr. Siddall testified that sex abuse would be evident in the records.

**{¶49}** Attorney Donald Hicks represented Jones during his trial. The trial court found that at the time of his testimony, Attorney Hicks had been practicing law for over thirty years, doing "a considerable amount of criminal defense work." When the grand jury initially indicted Jones with aggravated murder and rape, no death penalty specification was attached. Although Attorney Hicks was not certified to handle capital cases when he was appointed to Jones's case,

he was certified by the time the death penalty specification was attached to Jones's indictment. From the time of the original indictment to the time of Jones's trial, Attorney Hicks testified he had met with Jones fifty or sixty times and met with him at least a couple of times a week. He stated that some of the meetings were "face-time," as he had promised to meet with Jones any time he was at the jail. However, at other such meetings, he discussed the death penalty and mitigation with Jones. He further stated that such discussions occurred even before the death penalty specification was added because there had been ongoing discussions with the prosecutors about the possibility of the addition of the death penalty specification. The trial court further found that Attorney Hicks felt he had built a rapport and trust with Jones and during his discussions with Jones, he had gathered information that would be useful in the mitigation phase and incorporated that information into Jones's defense during both trial and the mitigation phase. Attorney Hicks testified that Jones never indicated that he had been sexually abused.

{¶50} Attorney Hicks recalled the primary family contact person was Jones's sister, Yolanda. He also recalled speaking to Yolanda "a couple of dozen times" on the phone and "eight or ten times, maybe a dozen" in person. Meetings occurred after court hearings and in his office. Attorney Hicks stated that the mitigation team "had a lot of contact with the family." However, there were never any indications from Yolanda, the Jones family, or any other contacts whose names were provided to the defense team that Jones had been subjected to sexual abuse. Although Attorney Hicks acknowledged the defense team got a late start hiring experts due to the timing of the death penalty specification, he felt he had enough time to prepare for the mitigation hearing. He stated he would have requested a continuance of the trial if he had felt they had not had enough time to prepare for mitigation and was confident the request would have

been granted as the trial court's predecessor judge had a reputation for being "exceedingly accommodating."

**{¶51}** Attorney Kerry O'Brien also represented Jones during his trial. The trial court found that at the time of his testimony, Attorney O'Brien had practiced law for over thirty-eight years and had been certified to handle capital cases since the mid-1980s and had defended over 30 death penalty cases. Attorney O'Brien testified that he met with Jones on average once a week and they had no communication or trust issues. He recalled speaking with Jones's mother mostly by telephone and recalled meeting with family members two or three times on Saturday or Sunday mornings at his office. The meetings included updates on the case and conferences. Attorney O'Brien testified that he explained the purpose of mitigation to the family and the goal of what they were trying to accomplish. He stated that he asks about "the complete family history from day one" and that he usually asked

> did the client have a rough upbringing, or what were the financial circumstances of the family, was there any physical abuse, did the defendant suffer any head injuries like fall off of a tree or hit by a car or hit by a baseball bat or something like that. And then I go into emotional or mental retardation. I then ask if the client had any mental evaluation. I also ask about sex abuse, whether an uncle or an aunt or something like that had molested him.

Attorney O'Brien stated that he would have absolutely used sexual abuse during mitigation if it had been mentioned. However, Jones denied any sexual abuse when Attorney O'Brien asked him about it.

### C. Conclusion - Counsels Performance

**{¶52}** Despite the extensive amount of mitigating evidence presented during Jones's mitigation hearing, *See Jones I*, 135 Ohio St.3d 110, 2012-Ohio-5677, at ¶ 224-256, Jones contends his defense counsel were ineffective for not finding more. However, the trial court determined that much of the credible lay witness testimony at the post-conviction relief hearing

was cumulative to that which was presented during the mitigation hearing. Further, the trial court determined that "because of the nature and quality of the mitigation facts Mr. Hrdy was able to obtain, as well as the lengthy time that pre-existed the death penalty specification, during which there were psychological reports, the development of a rapport with [Jones] and his attorneys (especially Mr. Hicks), communication with the family and information gathering, the late start was not detrimental to [Jones's] mitigation investigation." As shown above, these findings were supported by competent, credible evidence.

{¶53} With specific reference to the allegations of sexual abuse in the Jones family, the trial court acknowledged that the purpose of the post-conviction relief hearing was not to determine the merits of Jones's sexual abuse or incest claims, but to determine if the defense team should have reasonably discovered the abuse. However, in so doing, the trial court necessarily had to evaluate the testimony and credibility of the witnesses. The trial court found that the credible testimony in this case showed that all four members of the mitigation team asked about sexual abuse and that they were all met with denials. Based on the trial court's observations of the testimony and evidence presented at the post-conviction relief hearing, we conclude that this determination was supported by competent credible evidence.

{¶54} "The Sixth Amendment entitles criminal defendants to the '"effective assistance of counsel"'–that is, representation that does not fall 'below an objective standard of reasonableness' in light of 'prevailing professional norms.'"" *Bobby v. Van Hook*, 588 U.S. 4 (2009), quoting *Strickland*, 466 U.S. at 686, quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970). Counsel's failure to reasonably investigate a defendant's background and present mitigating evidence to the jury can constitute ineffective assistance of counsel. *Wiggins*, 539 U.S. at 521-522. However, "[t]he reasonableness of counsel's actions may be determined or

substantially influenced by the defendant's own statements or actions." *Strickland* at 691, citing *Decoster*, 624 F.2d at 209-210 (D.C.Cir.1976).

**{¶55}** In applying the above standard, the trial court determined that in light of the variety of circumstances Jones's trial counsel faced, their investigation was reasonable and thus, counsel was not ineffective for failing to discover additional alleged abuse. First, the trial court found that the mitigation team's failure to utilize the FETI method of questioning was not unreasonable as FETI did not come into existence until 2013. Second, Dr. Fradkin testified that "most men go to their graves without ever talking about [sexual abuse]" and the disclosure of sexual abuse "varies from person to person. It could take months. It could take years." Consequently, the trial court determined that even assuming there was any truth to the allegations of sexual abuse and incest within the Jones family,

> in light of the 30 years of failure of trained medical, psychiatric, psychological and education professionals to uncover the abuse, to require his attorneys to discover such information in the limited time provided by the time constraints of a criminal trial in which the defendant is incarcerated is unreasonable and beyond any requirements of the ABA Guidelines.

Third, Dr. Stinson testified that the abuse may have been disclosed now "because main perpetrators and the main individuals who said we do not talk about this eventually died." The trial court further determined that if that was the case, Jones's defense counsel would have had no chance of obtaining any type of disclosure since Jones's mother was still alive at the time of the mitigation investigation.

**{¶56}** As the trial court applied the appropriate legal standard and the trial court's findings were based upon competent credible evidence, we cannot conclude that the trial court abused its discretion when it determined that Jones's trial counsel did not render deficient performance when they failed to discover alleged sexual abuse and additional alleged physical

and emotional abuse perpetrated against Jones during their mitigation investigation. *See Maryland v. Kulbicki*, 136 S.Ct. 2, 4-5 (2015) (recognizing that the right to effective assistance of counsel does not demand that lawyers go "looking for a needle in a haystack" when they have "reason to doubt there is any needle there.") As Jones has failed to show that his trial counsel rendered deficient performance during their mitigation investigation we need not address whether Jones was prejudiced. *See Ray*, 9th Dist. No. 22459, 2005-Ohio-4941 at ¶ 10.

**2. Dr. Siddall's Evaluation & Diagnosis**

**{¶57}** Jones next argues that Dr. Siddall had neither the time nor the information necessary to perform a complete a psychological evaluation and make a diagnosis for the purposes of the mitigation hearing. Thus, the extent of Jones's mental illness was not discovered and his trial counsel's assistance was ineffective due to their failure to adequately review Jones's mental health records and ensure that Dr. Siddall did so as well.

**{¶58}** Dr. Siddall's testimony regarding Jones's mental illness during the mitigation hearing was summarized by the Supreme Court of Ohio in the following way:

> In summary, Dr. Siddall testified that Jones has "a chronic history of mental illness which has required very expansive psychiatric treatment while he was incarcerated and in the community." Jones has been repeatedly hospitalized and been treated with antidepressants, mood-stabilizing drugs, and antipsychotic medications. Jones was also raised in a family with a long history of psychiatric problems, alcohol and drug abuse, domestic violence, and involvement with the criminal-justice system. Dr. Siddall testified that these severe problems affect most members of Jones's family and represent "a rather unusual cluster of very serious problems in a given family." He opined that "certain psychiatric problems, certain psychological problems * * * are known to be biologically based * * * [and were] genetically transmitted * * * across generations in the Jones family."

> During cross-examination, Dr. Siddall acknowledged that a Dr. Stafford, a psychiatrist who treated Jones at the Oakwood Forensic Hospital, reported that Jones admitted that he falsely reported hearing voices. Dr. Stafford concluded, "He is not psychotic at all. His whole outlook is due to malingering and put on." Dr. Stafford's report also stated that Jones "puts on psychosis due to experience

with mental health professionals through the years. He is difficult to differentiate because he is clever to answer vaguely."[1]

*Jones I*, 135 Ohio St.3d, 2012-Ohio-5677, at ¶ 236-237.

**{¶59}** Dr. Siddall is an expert in forensic psychology and testified as an expert in "maybe a dozen" capital mitigation hearings prior to Jones's case. He testified at Jones's post-conviction relief hearing as a witness for the State. Based on this testimony, the trial court found that he is licensed in both clinical and forensic psychology and also practices in the area of drug addiction. He has been licensed since 1975, is published and has received awards. At the time of his testimony, Dr. Siddall had taught graduate level courses, including courses on diagnosis. Although he is currently in private practice, Dr. Siddall has had significant experience with persons in a criminal legal setting through his work at a diagnostic clinic.

**{¶60}** Dr. Siddall stated that as a rule he would get records and complete his report before the start of trial, but in this case he completed his report after Jones's trial, but before the mitigation phase. Dr. Siddall stated that when he first became involved in the case, "[t]here was a ship load of records that came in and continued to come in." He also stated that he thought he had received some records after he had completed his report, but did not recall which ones. The trial court found that Dr. Siddall's report identified his documentary sources as Jones's educational records from Akron Public Schools (1978-1986), as well as mental health records from the Ohio Department of Rehabilitation and Corrections, Summit Psychological Associates, Portage Path Mental Health Center, and the Psycho-Diagnostic Clinic. Dr. Siddall also visited Jones in the Summit County Jail on two occasions, spending about three and a half hours at each visit. The visits were divided equally between interviewing and testing Jones. The trial court

---

[1] The trial court noted in its decision that "[t]he report attributed to Dr. Stafford in the Supreme Court opinion was actually the April 18, 1996 report of Dr. Khalid Matouk."

found that Dr. Siddall's invoice documented billing for 32.75 hours of casework, which included interviews, testing, record review, and consultations with Jones's attorneys and mitigation specialist. In addition to the documentary sources, Dr. Siddall relied on information from Jones and detailed family information he received from Mr. Hrdy. Dr. Siddall testified that he had enough time to complete the tasks he was assigned to do, but that he had also been aware that if he needed additional time, he would be able to ask for and receive more time.

{¶61} Dr. Siddall diagnosed Jones with a mood disorder. Dr. Siddall testified that he was aware that other diagnoses had been made with regard to Jones that differed from the one to which he opined during mitigation. However, he testified that it would be inappropriate for him to diagnose Jones by giving him a diagnosis given by another doctor rather than making his own diagnosis. Dr. Siddall stated that "you have to understand that anybody that has been in the system for years will probably have many diagnoses" and that "[t]he important thing here is that the core of defendant's psychological problems included a depressive disorder, psychotic like features, and the history of antisocial behavior. Those are the things that needed to be represented in the diagnosis. There is various ways of labeling them."

{¶62} At the post-conviction relief hearing, Jones called three expert witnesses to testify concerning his mental health. The first was Dr. Jeffery Madden. Dr. Madden is an expert in neuropsychology. The trial court found that Dr. Madden had performed a battery of neuropsychological tests on Jones to determine if there were any signs of organic brain injury. During his post-conviction relief testimony, he opined that those results validated Jones's prior diagnosis of schizoaffetive disorder-bipolar type. However, Dr. Madden could not opine to a reasonable degree of neuropsychological certainty as to the presence or absence of neurological dysfunction or whether Jones suffered from a cognitive disorder attributable to organic brain

damage. However, Dr. Madden did opine to a reasonable degree of scientific certainty that Jones was not malingering at the time that Dr. Madden conducted his tests in January 2013.

{¶63} Jones also called Dr. Gary Beven, an expert in psychiatry and forensic psychiatry. The trial court found that Dr. Beven was the Chief Psychiatrist at the Southern Ohio Correctional Facility from 1995-2003, during which time Jones was incarcerated at the facility. Dr. Beven was the primary lead of the mental health team and provided Jones with mental health treatment. Dr. Beven had examined Jones 35 times while he was incarcerated and had diagnosed Jones with shizoaffective disorder-bipolar type with personality disorder. During the entire time of Dr. Beven's treatment of Jones, Jones remained on the mental health C.I.C. caseload, indicating serious and chronic mental illness. Dr. Beven acknowledged a discussion of malingering or exaggeration in his case notes, but that discussion did not cause him to second-guess his diagnosis of Jones. Dr. Beven's last contact with Jones was in 2003 and he could not offer any testimony about Jones after that time. Jones's original mitigation team did not contact Dr. Beven prior to Jones's capital trial.

{¶64} Jones also called Dr. Bob Stinson, an expert in forensic psychology. The trial court found that Dr. Stinson testified about the dysfunction and abuse with the Jones family. He personally interviewed Jones, but did not conduct any tests on Jones. In addition to the interview, Dr. Stinson relied upon the affidavits of family members and Dr. Fradkin's report. Dr. Stinson opined to a reasonable degree of psychological certainty that Jones suffers from schizoaffective disorder, bipolar type. During his testimony, Dr. Stinson was critical of Dr. Siddall's diagnosis of mood disorder, his testing methods, his mitigation testimony regarding Jones's malingering, and the amout of time Dr. Siddall spent with Jones. Dr. Stinson was further critical of the amount of time Dr. Siddall spent reviewing Jones's records. However, when

testifying about the difference between his diagnosis and that of Dr. Siddall's, Dr. Stinson stated that "we are actually not as far off as it may seem, but mood disorder not otherwise specified is our label for saying, I see a mood component to his illness, but I don't have enough information to tell you exactly what category it fits in." Dr. Stinson's further stated that he would not say Dr. Siddall's diagnosis was wrong, but that he did not have enough information to give a more specific diagnosis.

{¶65} Despite the extensive amount of mitigating evidence presented during Jones's mitigation hearing, *See Jones I*, 135 Ohio St.3d, 2012-Ohio-5677 at ¶ 224-256, Jones contends his defense counsel were ineffective due to their failure to adequately review Jones's mental health records and ensure that Dr. Siddall did so as well. However, even assuming without concluding that counsel was deficient, Jones is not able to show he was prejudiced by the mitigation investigation into his history of mental illness. When assessing prejudice, "'the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" *Herring*, 142 Ohio St.3d, 2014-Ohio-5228, at ¶ 116, quoting *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, ¶ 163, quoting *Strickland*, 466 U.S. at 694. Accordingly, "[a]dditional mitigating evidence that is merely cumulative of that already presented does not undermine the results of sentencing." (Internal quotations omitted.) *Id.* at ¶ 117.

{¶66} In this case, the trial court determined that the testimony given about the manifestations of Jones's mental illness given by Dr. Stinson and Dr. Beven was consistent with and cumulative of the testimony presented by Dr. Siddall at Jones's mitigation hearing. Specifically, the trial court found that "[w]hile [Jones] is mentally ill, his mental illness is

inextricably wrapped around his anti-social personality disorder." The trial court based this determination on the "scores of case notes in the prison records and other documents submitted as evidence." The trial court then pointed to Dr. Siddall's mitigation testimony, in which he gave a significantly more detailed diagnosis than just the named disorder and determined that despite the differing names of the diagnoses, Dr. Stinson's and Dr. Beven's testimonies about the manifestations of Jones's mental illness and the medications used to treat him was consistent with and cumulative of testimony given by Dr. Siddall at the mitigation hearing. Such manifestations included suicide attempts, self-mutilation, depression, hallucinations, and psychiatric hospitalizations and the medications included mood stabilizing drugs for bipolar disorder and antipsychotic drugs. The trial court additionally noted that when testifying about the differences between his diagnosis and Dr. Siddall's, Dr. Stinson stated that their diagnoses were "not as far off as it may seem" and that in his own report, Dr. Stinson did not reference any of the records he suggested Dr. Siddall needed in order to have a more complete picture of Jones's mental illness. However, when forming his opinion, the trial court noted that Dr. Stinson did not have access to the 1448 pages of mental health records contained in Jones's ODRC records, was selective in his use of the information in some of Jones's other records, and did not personally conduct any tests on Jones. Accordingly, we conclude that the trial court's determination that the testimony given by Dr. Stinson and Dr. Beven was consistent with and cumulative of the testimony presented by Dr. Siddall at Jones's mitigation hearing did not constitute an abuse of discretion.

{¶67} Furthermore, the trial court determined that Jones's argument that Dr. Siddall used an inappropriate method to diagnosis Jones's malingering ignored the fact that Dr. Stafford also opined that Jones showed evidence of malingering during his competency evaluation.

During his testimony, Dr. Siddall pointed out that mental illness and malingering are not mutually exclusive. Furthermore, Dr. Siddall's testimony regarding malingering was part of the focus of the State's cross-examination on Jones's history of malingering and that Dr. Siddall addressed the malingering the most positive way possible.

{¶68} Therefore, we cannot conclude that the trial court abused its discretion when it determined that the testimony given about the manifestations of Jones's mental illness given by Dr. Stinson and Dr. Beven was consistent with and cumulative of the testimony presented by Dr. Siddall at Jones's mitigation hearing. As Jones has failed to show he was prejudiced by his counsels' actions we need not address whether counsel was deficient. *See Ray*, 2005-Ohio-4941 at ¶ 10.

## C. Conclusion

{¶69} Jones has failed to demonstrate the trial court abused its discretion when it determined that Jones's trial counsel was not deficient for failing to discover further alleged abuse during their mitigation investigation or that Jones was prejudiced by counsel's alleged failure to discover the extent of Jones's mental illness. Therefore, Jones's first assignment of error is overruled.

### Assignment of Error II

**The trial court erred by refusing to consider out of court statements for hearsay and nonhearsay purposes, in violation of Due Process and Ohio law. [ ]**

{¶70} In his second assignment of error, Jones argues that the trial court erred by not considering out of court statements offered other than for the truth of the matter asserted or for other non-hearsay purposes. The first statements Jones argues that the trial court should have considered were made by his mother in an affidavit sworn to before her death. The second set of

statements were out of court statements made by individuals not testifying at the hearing for post-conviction relief about which Jones's sisters attempted to testify to during the hearing. Both sets of statements were made regarding alleged sexual abuse which occurred within the Jones family.

{¶71} "The decision to admit or exclude evidence at trial lies within the sound discretion of the trial judge, and the court's decision will not be reversed absent a showing of an abuse of discretion." *State v. Stover*, 9th Dist. Wayne No. 13CA0035, 2014-Ohio-2572, ¶ 7. An abuse of discretion is more than an error in judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶72} Hearsay is inadmissible except as otherwise provided in the Ohio Rules of Evidence or other relevant constitutional or statutory provisions. Evid.R. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801.

{¶73} Prior to Jones's post-conviction relief hearing, Jones filed a motion in limine requesting the trial court allow the affidavit of Jones's now deceased mother to be admitted into evidence at the hearing. The trial court denied the motion in part and granted it in part. The trial court found that part of the affidavit contains a claim "which goes to the issue of ineffective assistance of counsel" and as such went to the heart of the very issue before the trial court in the post-conviction relief hearing. The trial court further determined that the statements were not admissible as statements against interest. Thus, the statements "must be subject to cross-examination to be admissible." However, the trial court did find that statements within the

affidavit pertaining to personal or family history were admissible for the truth of the matter asserted pursuant to Evid.R. 804(B)(4). Jones reasserted the issue during his hearing and the trial court again denied Jones's request to admit those statements within the affidavit which went to the issue of ineffective assistance of counsel, thus preserving the issue for appeal.

{¶74} First, Jones argues these hearsay statements should have been admitted pursuant to *Green v. Georgia*, 442 U.S. 95 (1979). Specifically, Jones contends that the out of court statements at issue in Jones's mother's affidavit should have been admitted because they would have been admissible during the mitigation phase of Jones's capital trial. In *Green*, the Supreme Court "carved out an exception to evidentiary rules for mitigation evidence in extreme circumstances when its exclusion would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v. Sheppard*, 84 Ohio St.3d 230, 237 (1998), citing *Green* at 97. However, the holding in *Green* addressed the exclusion of hearsay evidence where "[t]he excluded testimony was highly relevant to a critical issue *in the punishment phase* of trial." (Emphasis added.) *Id.* The present appeal was taken after Jones's hearing on his motion for post-conviction relief, not after Jones's sentencing hearing.

{¶75} In Ohio, post-conviction relief is governed by statute and the right to file a petition for post-conviction relief is a statutory right, not a constitutional one. *State v. Calhoun*, 86 Ohio St.3d 279, 281 (1999); R.C. 2953.21. Additionally, "a postconviction proceeding is not an appeal of a criminal conviction but, rather, a collateral civil attack on the judgment." *Id.* R.C. 2953.21(A)(1)(a) provides that any person who has been convicted of a criminal offense may petition the court for post-conviction relief pursuant to a claim "that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." Thus, Jones's reliance on *Green* is

misplaced because the evidentiary hearing on Jones's request for post-conviction relief is a separate and distinct proceeding from the punishment or mitigation phase of his trial.

**{¶76}** "R.C. 2953.21 grants a petitioner only those rights specifically enumerated in its provisions and no more." *State v. Broom*, 146 Ohio St.3d 60, 2016-Ohio-1028, ¶ 28, citing *Calhoun* at 281. R.C. 2953.21 does not carve out any exceptions to the rules of evidence during a hearing for post-conviction relief. Thus, "[e]videntiary hearings under R.C. 2953.21 are subject to the rules of evidence." *State v. Jeffers*, 10th Dist. Franklin No. 10AP-1112, 2011-Ohio-3555, ¶ 25; *See State v. Brinkley*, 6th Dist. Lucas No. L-04-1066, 2004-Ohio-5666, ¶ 12-14; *See also State v. Morgan*, 10th Dist. Franklin No. 95APA03-382, 1995 WL 694489, at 3 (Nov. 21, 1995) (concluding that although it was necessary for appellant to submit affidavits in order for the trial court to determine whether he was entitled to a hearing, once the trial court granted that hearing, it became necessary for him to produce admissible evidence under the rules of evidence.). Accordingly, we cannot say that the trial court abused its discretion when it excluded hearsay testimony from Jones's sisters.

**{¶77}** Next, Jones argues that Jones's mother's affidavit was admissible pursuant to Evid.R. 804(B)(3) as a statement against interest because Jones's mother "subjected herself to possible perjury charges." That rules states that if the declarant is unavailable as a witness, the following is not excluded by the hearsay rule:

> A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement.

Evid.R. 804(B)(3). A witness who "is unable to be present or to testify at the hearing because of death" is considered an unavailable witness for the purposes of the hearsay exception. Evid.R. 804(A)(4). A person is guilty of perjury when, in any official proceeding, she knowingly makes a false statement under oath or affirmation, or knowingly swears or affirms the truth of a false statement previously made, when either statement is material. R.C. 2921.11(A). A falsification is material if it can affect the course or outcome of the proceeding. R.C. 2921.11(B).

{¶78} In denying the motion in limine, the trial court noted that Jones's mother's affidavit differed "somewhat" from her testimony during trial, such as portraying Jones's father as a good father and provider during trial, but calling him "mean and harsh[2]" in her affidavit and stating that "he didn't provide for the family." The trial court found the fact that Jones's mother never states in her affidavit that she lied during her trial testimony or "that she purposely held back pertinent mitigation information" to be critical as that could have subjected her to criminal perjury charges.

{¶79} On appeal, Jones points to three instances in Jones's mother's mitigation testimony which differ from the statements in her affidavit and which may have subjected her to possible perjury charges. However, a review of the record shows no explicit contradiction of any material statement. Additionally, Jones's mother makes no statement in her affidavit that she made false statements during her mitigation testimony. The first exchange Jones points to went as follows:

> Q: Throughout, all of your kids, the time they were growing up, when they were children to adults, have you always been very supportive of them?
>
> A: Yes.

---

[2] We note that a review of Jones's mother's affidavit shows that Jones's mother refers to Jones's paternal grandfather as "mean and harsh" and not Jones's father. However, the affidavit does refer to Jones's father as a "violent person."

Q: What about your husband? Was your husband, would you consider him a good role model for your kids?

A: Yes.

The second exchange was as follows:

Q: Okay. And would you describe the home that you and your husband provided to your kids a stable home, at least in terms of support and providing care for them?

A: Yes.

Finally, the third exchange happened as follows:

Q: Ma'am, your husband, Mr. Jones, you said that he worked for the post office. Did he end up retiring from the post office after thirty-seven years?

A: Yes.

Q: So he retired with a pension, obviously?

A: Yes.

Q: And, ma'am, you working at least a couple of jobs, between you and your husband, you probably made a fairly good living considering you had eight children?

A: Yes.

Q: And they were always provided for?

A: Yes.

* * *

Q: All right. So Mr. Jones, Phillip Jones's father, just a good guy who took care of his kids?

A: Yes, basically.

Jones argues that the above mitigation testimony is inconsistent with statements Jones's mother made in her affidavit. Although Jones does not point to any specific statements, a review of the

affidavit shows that Jones's mother made the following statements about Jones's father that are somewhat inconsistent to her mitigation testimony and were redacted from her affidavit:

19. Although [Jones's father] worked, he didn't provide for the family. He spent his money on other women. He drank a lot and came home drunk. He drank bourbon and whiskey. He also smoked reefer.

* * *

21. [Jones's father] cheated on me with other women. Once I followed him to the home of his mistress.

22. When my daughter Yolanda was young, someone I knew, [E.H.], had just been released from prison. My husband and I took him out. [Jones's father] brought him home with us and wanted me to have sex with [E.H.] while he watched. I said no. The two men then began to fight, and [Jones's father] grabbed an ax from the basement and began to swing it at [E.H.].

* * *

26. [Jones's father] and I argued a lot. He was a violent person. During one argument, he kicked me in the eye. * * * My children, including Phillip, saw the abuse. [Jones's father] broke my nose, gave me black eyes, and hit me in the head with a frying pan. In 1979, we divorced.

* * *

32. I disciplined my children with a belt. [Jones's father] also whooped the children sometimes, but he was too lenient. Once when Phillip was six or seven years old, he took money from his father's billfold while he was sleeping. [Jones's father] came to my work to tell me about it instead of disciplining Phillip. I gave Phillip a whooping.

* * *

38. When I was still living with my husband, and my daughters Yolanda and Rhonda were children (Yolanda might have been 10 or 11 years old), I couldn't find the knives in the kitchen. I eventually found them in my daughters' bedroom. They said they kept the knives in their beds for protection against their father, who tried to molest them. I didn't report my husband to the authorities.

* * *

41. In 1998, [Jones's father] and I married each other again.

42. In 2006, [Jones's father] died from cancer. Phillip took his father's death very hard.

{¶80} Although these statements seem inconsistent with Jones's mother's statement that she considered Jones's father a good role model, none of the statements in the affidavit directly contradict that opinion or suggest that Jones's mother testified falsely as to that opinion during her mitigation testimony. Likewise, Jones's mother's affidavit does not directly contradict her mitigation testimony affirming that she and Jones's father provided the Jones children with a stable home "in terms of support and providing care" and that the Jones children were "always provided for." The question posed during mitigation did not ask whether Jones's father provided for the Jones children, but rather: (1) whether Jones's *mother and father together* provided a stable home for the Jones children; and (2) whether the children were generally "always provided for." Accordingly, we cannot say that the trial court abused its discretion when it excluded hearsay statements in Jones's mother's affidavit.

{¶81} Alternatively, Jones argues that statements made by Jones's mother in her affidavit asserting abuse were admissible for the non-hearsay purpose of showing that she was willing to disclose abuse, regardless of the truth of those disclosures. However, the Supreme Court of Ohio has recognized that "'the well-worn phrase "not offered for the truth of the matter asserted" is not a talismanic incantation that opens the door to everything said outside the courtroom.'" *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, ¶ 25, quoting *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, ¶ 26 (6th Dist.). In this case, the trial court determined that Jones's mother's statements in her affidavit went "to the issue of ineffective assistance of counsel" and thus, went "to the very heart of the issue" before the trial court in the post-conviction relief hearing and therefore, "must be subject to cross-examination to be

admissible." Under these circumstances, we cannot say that the trial court abused its discretion when it excluded the statements.

{¶82} Therefore, Jones's second assignment of error is overruled

III.

{¶83} Jones's first and second assignments of error have been overruled. Therefore, the decision of the trial court dismissing Jones's petition for post-conviction relief is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

TEODOSIO, J.
CONCURS.

CARR, J.
CONCURRING.

{¶84} While I am troubled by various aspects of this case, I cannot say that the trial court's decision to deny Jones' petition after a full evidentiary hearing was unreasonable, arbitrary or unconscionable. *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶85} The performance of trial counsel and their mitigation team is of paramount importance in capital cases. Since we decided *Jones II*, the Ohio Supreme Court convened a Task Force to review the administration of the death penalty in Ohio. Among its recommendations, the Task Force recommended the adoption of the American Bar Association's Guidelines for death penalty counsel. It also recommended adoption of the Supplementary Guidelines for the defense mitigation team. These Guidelines establish a high bar for trial counsel and the mitigation team. Although the Ohio Supreme Court has declined to formally adopt these Guidelines, they nevertheless underscore the importance of counsel's preparation for the mitigation hearing.

{¶86} In this case, Jones' defense team agreed to a timetable that resulted in a scenario where Mr. Hrdy did not begin his mitigation work until one month prior to the commencement of the sentencing hearing. Consequently, Mr. Hrdy was restricted in the amount of time he could spend on the case and he was forced to conduct interviews under less than ideal circumstances. The accelerated nature of Mr. Hrdy's efforts is particularly concerning given that he did not learn about the sexual abuse that Jones allegedly suffered. After a thorough review of the evidentiary hearing transcript in this case, however, I cannot say that the trial court's ultimate decision to deny Jones' motion constituted an abuse of discretion.

APPEARANCES:

KIMBERLY RIGBY, LISA LAGOS, AND ALLAN VENDER, Assistant State Public Defenders for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.